ATTORNEY FOR APPELLANT
Joel M. Schumm
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

# In the
# Indiana Supreme Court

No. 49S04-1606-JT-350



FILED
Aug 16 2016, 11:27 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN RE THE INVOLUNTARY TERMINATION OF
THE PARENT-CHILD RELATIONSHIP OF R.S.,
(Minor Child), AND R.S. (Father)

R.S. (Father)

*Appellant (Respondent below)*,

v.

MARION COUNTY DEPARTMENT
OF CHILD SERVICES,

*Appellee (Petitioner below)*,

and

CHILD ADVOCATES, INC.,
Co-Appellee (Guardian ad Litem).

Appeal from the Marion Superior Court, No. 49D09-1503-JT-96
The Honorable Marilyn A. Moores, Judge
The Honorable Larry E. Bradley, Magistrate

On Petition to Transfer from the Indiana Court of Appeals, No. 49A04-1508-JT-1141

**David, Justice.**

This case involves the fundamental right of a parent to the care, custody, and control of his or her child. Because this relationship should be severed only when all reasonable efforts to maintain the relationship have failed, we reverse the trial court's order terminating the parental rights of Father to his son, R.S., II.

## Facts and Procedural History

R.S. (Father) and L.H. (Mother) are the parents of ten-year-old R.S., II (R.S.). In December 2009, Father pled guilty to a Class B felony and a no contact order was entered between Father and Mother. During Father's incarceration, Mother cared for R.S, but Father stayed in contact by writing letters to R.S. on a weekly basis and sending gifts. Father was released on probation in March 2013.

In April 2014, the Department of Child Services (DCS) alleged that R.S. was a child in need of services (CHINS) because of Mother's drug use and Father's lack of involvement. R.S. was placed with his maternal grandmother (Grandmother). Father requested that R.S. be placed with him, but DCS objected based upon an alleged no contact order between Father and R.S. Father informed the court that there was not a no contact order between himself and R.S., and he had documentation to support his claim. However, because the court and DCS believed otherwise, no parenting time was ordered for Father. In the meantime, DCS took no action to assess whether there was a valid no contact order between Father and R.S. It was not until June 10, 2015, when

2

the Guardian Ad Litem (GAL) brought to the trial court's attention that there was not a no contact order between Father and R.S., that Father was ordered parenting time.[1]

Subsequently, R.S. was found to be a CHINS as to Mother and Father. Father was ordered to participate in various services, including parenting classes, parenting assessment, and a Father Engagement Program. Father did not attend the disposition hearing, and he claimed to be unaware of any order to participate in services. Father also failed to appear for several of the subsequent court proceedings involving R.S. Thus, Father was largely absent during the CHINS action.

Despite his failure to complete the programs ordered by the court in relation to the CHINS proceeding, while incarcerated, Father completed various parenting and self-improvement courses.[2] Father also successfully completed the Commercial Driver's License Course and successfully completed probation as of March 30, 2015. As a condition of probation, Father completed substance abuse evaluation and treatment, fifty-two weeks of domestic violence counseling, and a mental health evaluation.

On March 19, 2015, DCS filed a petition to terminate Father's parental rights. Even after the termination petition was filed, Father requested that he again be referred to services. His request for services was denied, but the court granted him supervised visitation. Mother consented to R.S.'s adoption. Therefore, a termination hearing was held as to Father only.

---

[1] At a pre-trial conference on April 30, 2014, the court acknowledged that there was still confusion regarding whether there was a no contact order between R.S. and Father. Rather than seeking clarification, the court ordered that Father have supervised visitation "as long as there is no, no-contact order in place as to [Father]." (Tr. Exh. at 17.)

[2] These courses included: Alcohol Substance Self Help Group (Father also testified that he has been sober for seven years), Inside Out Dads, Family Matters, Character First, Uncommon, Quiet Strength, Growth Responsibility Integrity Purpose (GRIP), and anger management.

At the termination hearing, it became apparent that while the CHINS action was pending, Father had, in fact, been seeing R.S. on a regular basis, despite Father's absence from court proceedings and a couple of the court-ordered supervised visitations. Father had been visiting with R.S. two to three times a week, taking him swimming and paying for swimming activities, exercising overnights with R.S. on the weekends, and going to Grandmother's house upon her request to help resolve issues Grandmother was having with R.S.'s behavior.

The DCS case manager, the home-based therapist, and the GAL, all agreed that adoption by Grandmother was in R.S.'s best interests. However, there was a general consensus that R.S. and Father shared a close bond. The GAL believed that continued visitation between R.S. and Father was in R.S.'s best interests. Nevertheless, the trial court concluded that continuation of the parent-child relationship posed a threat to R.S.'s well-being by depriving him of permanency, and that termination was in the best interests of R.S.

Father appealed the termination of his parental rights, but the Court of Appeals affirmed the trial court. R.S. v. Ind. Dep't of Child Servs., 49A04-1508-JT-1141 (Ind. Ct. App. March 23, 2016). We now grant transfer and reverse the trial court's termination of Father's parental rights with R.S., thereby vacating the Court of Appeals opinion. Ind. App. Rule 58(A).

**Standard of Review**

When reviewing the termination of parental rights, this Court does not reweigh the evidence or judge the credibility of witnesses. In re I.A., 934 N.E.2d 1127, 1132 (Ind. 2010) (citation omitted). When the trial court has entered findings of fact and conclusions of law, "we apply a two-tiered standard of review." Id. "First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment." Id. The judgment will be set aside if found to be clearly erroneous. Id. However, this Court may also consider the statutory requirement that in a proceeding to terminate parental rights, the findings

4

must be supported by clear and convincing evidence. Id. Thus, "we review the trial court's judgment to determine whether the evidence clearly and convincingly supports the findings and the findings clearly and convincingly support the judgment." Id.

**Discussion and Decision**

As this Court and the United States Supreme Court have reiterated many times, "[a] parent's interest in the care, custody, and control of his or her children is 'perhaps the oldest of the fundamental liberty interests.'" Bester v. Lake Co. Office of Family & Children, 839 N.E.2d 143, 147 (Ind. 2005) (quoting Troxel v. Granville, 530 U.S. 57, 65 (2000)). Although parental interests are not absolute, "the parent-child relationship is 'one of the most valued relationships in our culture.'" Id. at 147 (citing Neal v. DeKalb Cnty. Div. of Family & Children, 796 N.E.2d 280, 285 (Ind. 2003)). Due to this, the Indiana statute governing termination of parental rights sets a high bar for severing this constitutionally protected relationship.

Under Indiana Code section 31-35-2-4(b), a petition seeking to terminate the parent-child relationship must allege the following:

> (A)    that one (1) of the following is true:
> (i)    The child has been removed from the parent for at least six
> (6) months under a dispositional decree.
>
> *    *    *    *
>
> (B)  that one (1) of the following is true:
> (i) There is a reasonable probability that the conditions that resulted
> in the child's removal or the reasons for placement outside the home
> of the parents will not be remedied.
> (ii) There is a reasonable probability that the continuation of the
> parent-child relationship poses a threat to the well-being of the child.

5

\* \* \* \*

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

The State must prove each element by clear and convincing evidence. In re I.A. at 1132.

On appeal, Father argued that there was insufficient clear and convincing evidence supporting the trial court's conclusion that termination was in the R.S.'s best interests and that there was not a satisfactory plan for the care of R.S. after termination. Because we are persuaded that the findings do not support the conclusion that termination is in R.S.'s best interests, we do not reach the issue of whether there was a satisfactory plan for the care and treatment of R.S. See In re G.Y., 904 N.E.2d 1257, 1261 (Ind. 2009) (explaining that "if the State fails to prove any one of these four statutory elements, then it is not entitled to a judgment terminating parental rights").

In reaching this determination, we consider the trial court's findings regarding the best interests of R.S.:

> 26. Although there was confusion regarding a No Contact Order, [Father] had consistent contact with [R.S.] as a result of [R.S.] visiting or staying overnight with his paternal grandmother with whom [Father] now resides.
>
> \* \* \* \*
>
> 28. [Father] did not see [R.S.] during his incarceration but kept in contact with him.
>
> 29. While incarcerated [Father] took several courses or programs to better him [sic], including the Therapeutic Community designed for people with a history of substance abuse.
>
> 30. As a condition of probation, [Father] completed a [sic] fifty-two weeks of domestic violence counseling in June of 2014.

6

*      *      *      *

36. [Father] and [R.S.] share a bond. [R.S.] does love his father.

37. [R.S.] would like to stay with his grandmother and likes to visit with his father.

*      *      *      *

48. Continuation of the parent-child relationship poses a threat to [R.S.]'s well-being in that it would pose a barrier to obtaining the permanency that he needs and strives through an adoption. To do otherwise could threaten the great progress [R.S.] has made in his special needs. Given additional time, and if [Father] was to follow through with services, he would have to complete therapy with [R.S.], still undergo a parenting assessment and obtain stable housing and an adequate income. After having the ChINS [sic] matter pend for fifteen month [sic], [Father] would be just beginning.

49. Termination of the parent-child relationship is in the best interests of [R.S.]. Termination would allow him to be adopted into a stable and permanent home where his needs will continue to be met. *It would be best for [R.S.] to be able to keep visiting his father* and paternal grandmother, but staying in his placement is in his long term interests.

50. Family Case Manager Deen, who has been on the ChINS [sic] case since it was filed, believes adoption is in [R.S.]'s best interests given that he is bonded and comfortable with his grandmother. She does not believe [Father] would follow up if given more time and adoption would provide permanency for [R.S.].

(App. at 14-15.) (emphasis added).


These findings do not demonstrate clearly and convincingly that termination is in R.S.'s best interests. Rather, it is overwhelmingly apparent through the trial court's own findings and testimony provided at the termination hearing that Father and R.S. both love one another and have

7

a close bond. Additionally, Father exercised parenting time with R.S. two to three times a week, including overnights with R.S., and it is the trial court's own conclusion that continued visitation with Father is in R.S.'s best interests. Father's failure to attend every scheduled supervised visitation or attend hearings during the course of the CHINS proceedings is not clear and convincing evidence that Father is uninterested or unwilling to parent R.S. While we strongly encourage parents to comply with the procedures and practices set out by the court and DCS when a child has been found a CHINS, we cannot ignore the fostered relationship, parenting, and individual improvement efforts that Father has personally undertaken.

Moreover, establishing permanency for R.S. was repeatedly expressed as a reason for termination. R.S. does currently have a stable home environment with Grandmother. However, when a child is in relative placement, and the permanency plan is adoption into the home where the child has lived for years already, prolonging the adoption is unlikely to have an effect upon the child. See Rowlett v. Vanderburgh Cnty. Office of Family & Children, 841 N.E.2d 615, 619, 623 (Ind. Ct. App. 2006). Further, even when a father has had a "troubled past" and "failings as a parent," our courts will also recognize "the positive steps [a] [f]ather has taken to turn his life around for the sake of himself and his children." Id. at 623. This is true even if the parent is not ready to "undertake full care" of the child and admits as much, but still wants a "chance to establish himself in the community and to participate in services . . . to make him a better person and parent." Id. In the present case, Father has repeatedly expressed his desire and willingness to continue to develop as a person and a parent for R.S.

In addition, termination of the father's parental rights in Rowlett was based upon even more concerning issues than those in the present case. Specifically, termination was sought due to the "[f]ather's criminal history, substance abuse, unstable housing, unstable employment history, and neglect of his children." Id. at 620. The father and mother in Rowlett allowed their children to live "in filth and squalor," exposing them to "drug-filled syringes and drug paraphernalia lying around the house and noxious gases from [f]ather's manufacture of methamphetamine in the

8

home." Id. at 621. The father and mother also failed to provide proper medical attention for the children, and the children were found wandering around outside unsupervised. Id. The court ultimately held that the father's participation in various programs and higher education coursework while incarcerated, his acknowledgement of his past indiscretions, and his hope to continue services and improve his life once he is released from incarceration, demonstrated that termination, at that point in time, was not in the best interests of the children. Id. at 622. The court explained, "[w]e readily acknowledge that there is no guarantee that [f]ather, following his release from prison, would prove himself to be an exemplary parent. The law, however, does not require such guarantees before a parent may attempt to demonstrate the desire and ability to achieve a meaningful reunification with his children." Id. at 623.

Unlike in Rowlett, in the present case, Father was never alleged to have engaged in such severe neglect of R.S. However, like the father in Rowlett, here Father has demonstrated the desire and ability to achieve a meaningful reunification with his child. Since Father's release from incarceration, he has repeatedly demonstrated a desire to parent R.S. and has made progress by his successful completion of probation and maintaining clear drug screens. Accordingly, termination is not in R.S.'s best interests at this time.

While we understand the obstacles presented when a parent fails to appear for hearings or does not participate in referred services, "[t]ermination is intended as a last resort, available only when all other reasonable efforts have failed."[3] In re V.A., 51 N.E.3d 1140, 1151-52 (Ind. 2016)

---

[3] We restate Justice Rucker's thoughtful comments from his dissenting opinion in In re E.M., to remain mindful that Indiana does not want to limit the opportunity for willing and able African-American fathers to parent their children:

> [R]esearch also unfortunately indicates that "[h]istorically, [c]hild [w]elfare [s]ervices have systematically minimized the role and the involvement of the African–American father." *Working with the African American Father: The Forgotten Parent,* California Public Child Welfare Training Academy Trainer Guide at 3 (2009). In training child welfare personnel in working with African–American families, agencies

9

(quoting In re I.A., 934 N.E.2d 1127, 1136 (Ind. 2010)). Given the loving bond that R.S. and Father share, Father's successful completion of multiple self-improvement and parenting courses, Father's successful completion of probation, his repeatedly expressed desire to parent R.S., and his exercise of regular visitation with R.S., "we do not believe that this case has reached the 'last resort' stage." In re D.B., 942 N.E.2d 867, 875 (Ind. Ct. App. 2011).

However, if in the future it becomes apparent that reunification is not a viable option, a subsequent petition for termination of parental rights or the appointment of a legal guardian could be pursued. Under Indiana Code section 31-34-21-7.5(c)(1)(E), a legal guardian serves as a "caretaker that is intended to be permanent and self-sustaining." Specified parental rights with respect to the child are transferred to the guardian, which include, "care, custody, and control of the child," along with "decision making concerning the child's upbringing." Id. Given R.S.'s bond with both Father and Grandmother, this may be a suitable alternative.

---

"traditionally place[ ] most ... emphasis on working with the mother with scant attention being paid to the father except as being an absent parent." *...Cf.* Leslie Brown, et al., *Manufacturing Ghost Fathers: The Paradox of Father Presence and Absence in Child Welfare,* 14 Child & Family Social Work 25, 26 (2009) (observing in a study of Canadian child welfare cases that "fathers were rarely considered as placement resources, even when the alternative was permanent guardianship. Grandmothers, usually maternal, were more likely to be sought as a resource for children. Fathers who expressed interest in custody were typically told to get a lawyer....").

4 N.E.3d 636, 655 (Ind. 2014).

**Conclusion**

We hold that the trial court's findings do not clearly and convincingly support its conclusion that termination of Father's parental rights is in the best interests of R.S. Therefore, we reverse the trial court's order terminating Father's parental rights.

Rush, C.J., Rucker, Massa and Slaughter, J.J., concur.