# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Feb 21 2017, 8:48 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Marianne Woolbert
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Majorie Newell
Deputy Attorneys General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent-Child Relationship of T.S., Mother, J.D.W., Father,[1] and J.W., Minor Child,

T.S.,

*Appellant-Respondent,*

v.

Indiana Department of Child Services,

February 21, 2017

Court of Appeals Case No.
48A02-1606-JT-1496

Appeal from the
Madison Circuit Court

The Honorable
G. George Pancol, Judge

Trial Court Cause No.
48C02-1508-JT-61

---

[1] Father does not participate in this appeal; however, according to Indiana Appellate Rule 17(A), a party of record in the trial court shall be a party on appeal.



*Appellee-Petitioner.*

**Kirsch, Judge.**

T.S. ("Mother") appeals the juvenile court's order terminating her parental rights to her child, J.W. ("Child"). On appeal, Mother raises the following restated issue: whether the judgment terminating Mother's parental rights was clearly erroneous because it was based on insufficient evidence.

We affirm.

## Facts and Procedural History[2]

Mother and J.D.W ("Father") are the biological parents of Child, born June 6, 2004. Mother placed Child in the care of Father and Father's girlfriend sometime after December 25, 2013. A few days later, on New Year's Eve, Father checked himself into a rehabilitation center for alcoholism, leaving Child in the girlfriend's care. On January 4, 2014, the girlfriend kicked Child out of

---

[2] The juvenile court also terminated Child's father's parental rights; however, the father does not appeal. Here, we set forth only the facts pertinent to the termination of Mother's parental rights.

the home, saying that she no longer wanted to care for Child. *DCS Ex.* N at 2. The police became involved and contacted Mother, who said that she could not at that time care for Child. Accordingly, DCS took Child into its custody.

[4] On January 8, 2014, DCS filed a petition alleging that Child was a child in need of services ("CHINS"). When Mother did not appear at the initial hearing, the CHINS court continued the hearing to January 22, 2014. At that time, Mother again failed to appear, and the CHINS court entered a default order finding Child to be a CHINS. At the February 2014 dispositional hearing, the CHINS court set aside the default judgment and, over DCS's objection, allowed Mother to enter a general admission. The CHINS court then ordered Mother to participate in and follow the recommended services, including, individual counseling, parent evaluation, and substance abuse evaluation. The CHINS court also ordered Mother to have supervised visitation with Child. At the July 2014 review hearing, the CHINS court found that Mother had not complied with Child's case plan, had continued to test positive for illegal substances, and had failed to enhance her ability to fulfill parental obligations.

[5] About a year later, on July 23, 2015, the CHINS court ordered Child's permanency plan changed from reunification to adoption. By August 2015, the CHINS court had suspended Mother's visitation and most of her services. That same month, DCS filed its petition to terminate Mother's parental rights to Child. At a review hearing, the juvenile court set the matter for a December 2015 fact-finding hearing, which was rescheduled to February 2016 on

Mother's motion. Ultimately, the fact-finding hearing was held on February 23, 2016 and continued on May 16, 2016.

[6] During the course of the proceedings, Child was placed in her first foster home in February 2014, where she remained until June 2014, at which time her foster parents reported that they could no longer care for Child because she was physically and verbally aggressive, and she could not get along with another child in the home. In June 2014, Child was placed in a second foster home, where she remained until December 2015. In December 2015, Child's behavior, again, resulted in Child being removed from the home, and when Child threatened she was going to harm herself, she was admitted to the hospital. After Child left the hospital, she was placed in a third foster home. Child lived in the third foster home for only a few days until her behavior caused her to be placed in a treatment facility; Child still lived in the treatment facility at the time of the February 23, 2016 evidentiary hearing. On February 29, 2016, Child left the treatment facility and was placed in the fourth foster home, where she resided at the time of the May, 16, 2016 hearing.

[7] A total of seven witnesses testified at the two-day evidentiary hearing.[3] On the first day of the hearing, Michelline Gaddis ("Gaddis"), a home-based therapist with Youth Service Bureau, testified that she began working with Child around December 2014, when Child was approximately ten years old. Gaddis met

---

[3] We note that Mother arrived late at first day of the hearing held, on February 23, 2016, and did not appear at the second day of the hearing, held on May 16, 2016.

with Child on a weekly basis, but she never met Mother. *Tr.* at 15, 33. Tests revealed that Child suffered from post-traumatic stress disorder. *Id.* at 18. Accordingly, Gaddis determined that Child would benefit from "a trauma focus CBT approach," which was a twelve-week program, "working through a workbook, . . . identifying emotions and those emotional triggers that go along with trauma." *Id.* at 16. Child had a "broken relationship" with Mother, which manifested itself in Child's aggression and feelings of abandonment. *Id.* at 17-18. Gaddis testified that Child completed the program and made great strides toward identifying emotions and their impact on her behavior, thereby, allowing her to manage her behavior. *Id.* at 17. Right after completing the program, Child "was in a really good place" and had "a toolbox . . . of coping skills." *Id.* at 19. However, Child was still visiting with Mother, which made Child uncertain about her future and "frustrated about the whole situation of not knowing what comes next for her." *Id.* at 22-23. The visits also made Child susceptible to emotional triggers, which in turn resulted in Child being physically and verbally aggressive at school and at home. One evening, Child was in "a high state of agitation" and was pacing and ripping up paper. *Id.* at 23. That night, Child's behavior escalated to the point where she threatened and choked her second foster mother. *Id.* at 22, 23.

[8]  Gaddis testified that Child had been through complex trauma, having witnessed violence while living with Mother. *Id.* at 24, 25. Additionally, individuals came in and out of her life, which created "a lot of fear of the unknown[,] of unknown people." *Id.* at 26. Based on Child's escalating bad behavior, and

because that behavior was affecting Child's "daily functioning," Gaddis recommended that visitation with Mother be suspended. *Id*. at 28. Gaddis stated that Child was "a bit calmer" after visitation with Mother was suspended; however, Child was still aware of timelines and "where things were in the Court setting." *Id*. at 29. Gaddis testified that Child needed "security and consistency," and it was in Child's best interest to "move on[,] . . . she needs somebody to care for her." *Id*. at 32.

[9] At the second day of the fact-finding hearing, Paula Scott ("FCM Scott"), a DCS permanency family case manager, testified that Child was in her fourth, and current, foster home, she was "doing very well" in her new placement, and she was coming "out of her shell." *Id*. at 49. During FCM Scott's visits, Child, initially, had been shy and would not speak for herself; now Child was "more than willing to have a conversation." *Id*. FCM Scott testified that Child now carries on like a typical eleven-year-old girl, playing softball and doing well in school. *Id*. As part of the CHINS dispositional order, Mother was ordered to participate in individual and family counseling, complete parenting and substance abuse evaluations, and take part in supervised visitation with Child. *Id*. at 56. FCM Scott stated that Mother's visitation with Child had been at the home, but was moved after incidents where neighbors came to the house "highly intoxicated" and others were present during visitation without authorization. *Id*. at 65. When told that these interruptions were inappropriate, Mother always responded, that she "couldn't keep people away." *Id*. FCM Scott testified that, "it was always one excuse after another" as to why Mother

could not make her visits. *Id*. at 66. Mother's visitation was suspended in July 2015 because she was not compliant with the visitation rules, she cancelled or "no-showed" some of the visits, and Child asked to no longer visit with Mother. *Id*. at 63-64. Mother had not seen Child since visitations were suspended. *Id*. at 69. Although Mother called a few times to say she wanted to reestablish visits or phone calls with Child, FCM Scott testified that, "as with most things with [Mother,] it's always discussion and it's never put into action." *Id*. at 67. FCM Scott testified that during the CHINS and termination proceedings, Mother had been unable to keep consistent housing for herself. *Id*. at 68.

[10]     FCM Scott testified that Mother had taken about twenty-five random drug screens since January 2014, nineteen of which were positive, showing the presence of substances such as amphetamine, methamphetamine, ephedrine, THC, and cocaine. *Id*. FCM Scott testified that Mother complied with none of the service recommendations, and communication with Mother was sporadic because providers "always [had] to leave voice mails." *Id*. at 78-79. FCM Scott stated that the permanency plan for Child was adoption, and Child had made progress toward that goal by "making herself responsible for her own actions and her own behaviors" and the consequences therefrom. *Id*. at 80. FCM Scott, who had last seen Child in late April 2016, stated, "[F]rom everything that I'm hearing and seeing so far she is doing very well." *Id*. at 81.

[11]     Barbara Baumgartner ("Baumgartner"), a therapist with Meridian Health Services, had worked with Child since March 2016. She testified that Child had experienced significant trauma while living with Mother and, as a result, was

closed off and had trust issues. *Tr*. at 91. Baumgartner indicated that therapy was going well and that Child "knows she needs to deal with the issues she is facing." *Id*. at 93. One aspect of the therapy encourages Child to build her self-esteem so that she can talk about the emotional issues of her past. *Id*. at 94. Baumgartner described that in the prior two months Child had improved in matters of trust and emotional openness. *Id*. at 95. Baumgartner opined that Child needs to be involved and given support, especially since further delving into Child's past will "trigger" challenging behavior. *Id*. at 96, 98. The current foster mother is supportive and comes to most of the therapy sessions. *Id*. at 98. Baumgartner stated that Child was progressing well in her current foster home, and the family, who has one other child ("E."), includes Child in family activities and vacations. *Id*. at 96. Child is learning and adjusting to a "sibling type of competitive experience." *Id*. Baumgartner stated that predictability is "monumental" for any child that has suffered the kind of trauma suffered by Child, and it is also important for Child to have consistency, continuation, and structure. *Id*. at 99-100. It was Baumgartner's belief that the foster family provides those things for Child. *Id*. at 98-100. Further, Baumgartner stated that Child has only spoken of Mother once, and that was to say that she did not want to see Mother. It was Baumgartner's opinion that it would be detrimental for Child to resume visitation or have contact with Mother, concluding that it is in Child's best interests to terminate Mother's parental rights. *Id*. at 102.

[12] Karen Royer ("Royer"), a therapist with Villages of Indiana, had been involved in the therapeutic visitation between Mother and Child since around August

2014. As such, she helped mediate the visits and trained Mother on parenting skills. Royer stated that she was scheduled to meet with Mother once a week, but Mother missed about one meeting a month. Royer testified that the locations of the meetings changed from homes to libraries to motels because Mother was "moving around from one place to another." *Tr.* at 110-11. Royer helped Mother focus on positive things in her life, such as maintaining sobriety and developing judgment concerning who she could trust.[4] *Id.* at 112. Main goals for Mother were to establish stability in her life, get a job, get a home, and try to reestablish positive relationships with family members. *Id.* Royer testified that, to date, Mother had made limited progress, and she lacked stability in both her housing and finances. *Id.* at 113-14. Royer stated that Mother was usually late for her visits with Child and that Child asked that the visits stop, knowing that Mother's parental rights might be terminated. *Id.* at 116-17. When asked whether Mother's parental rights should be terminated, Royer stated that it is in Child's best interest to stay in foster placement, mostly because of Mother's lack of stability in her life and her history of not being able to parent a child that has severe behavioral problems. *Id.* at 119-20.

[13] Cory McCoy ("FCM McCoy"), a permanency family case manager for DCS, had worked with Mother, since January 2016, in a CHINS case involving Mother and her sixteen-year-old child ("C."). The allegations against Mother,

---

[4] In the past, one of Mother's friends stole her clothes, and another stole her dog. *Tr.* at 113.

which were later substantiated, indicated that Mother and C. were homeless, and Mother was abusing substances. A follow-up report stated that Mother and C. had gotten into a fight, and Mother had broken C.'s hand. *Id.* at 124. C. was removed from Mother's care and placed in "kinship placement," a home where Mother and C. had previously lived. *Id.* at 128. There, C. sustained third degree burns caused by sulfuric acid that she had been using to make methamphetamine. *Id.* at 127. As part of services, Mother was ordered to take drug screens. The most recent drug screen was conducted on April 8, 2016, about one month before the termination hearing, and indicated a positive result for the presence of methamphetamine and marijuana. *Id.* at 126.

[14] Delisa Strange ("Strange"), the current foster mother, testified that Child was placed in her home in February 2016 and that Child lived with Strange, her husband, and their son, E., who the parents had adopted after he was their foster child. The family lives in a four-bedroom house with three dogs, and Child has her own room. Strange, who testified that she did not work outside the home, stated that Child was doing extremely well at the home, completes required chores, and complies with house rules. *Id.* at 131. Child also does well in school and plays softball two times a week, and Strange had not received any negative reports from school. Child is easy to get along with, friendly, respectful, and well-mannered in public. Strange stated that Child is "just a sweet kid[]," and although "we still have our quirks," "we all seem to be getting along pretty well." *Id.* at 131. Strange indicated that Child was going to accompany the family on vacations to Virginia Beach and outings to French

Lick and the Daytona Air Museum. *Id*. at 132. Strange reported that, with the help of Baumgartner's therapy, Child and E. have learned that they both have a spot in the home and that no one is being pushed out. *Id*. at 33. Strange has helped Child with her reading, takes Child and E. to the library, and is encouraging Child to meet her parenting goals. *Id*. at 134. Child has expressed to Strange that she loves the family and wants to stay in the home, but she understands that, since she has lived in the home for only a few months, things will be taken day to day, and adoption will be discussed when it is time. *Id*. at 137.

[15] Nellie Elsten, Child's court appointed special advocate ("the CASA"), was appointed in September 2015. The CASA, who visited with Child once a month, testified that she last had contact with Child in April 2016. *Id*. at 141. Prior to placement with the Strange family, Child was shy, and her voice was very soft for the first half hour of the CASA's visit. In the current foster home, Child is "a very different child"; she is outgoing and talkative, speaks for herself, and is cheerful. *Id*. at 142. The CASA testified that it is in Child's best interests that Mother's parental rights be terminated to allow Child to be placed for adoption. *Id*.

[16] At the close of the fact-finding hearing, the juvenile court found that DCS had met its burden of proof, and it granted DCS's request to terminate Mother's parental rights. *Id*. at 143. On June 8, 2016, the juvenile court entered its order terminating Mother's parental rights. Mother now appeals.

# Discussion and Decision

[17] "The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re J.W., Jr.*, 27 N.E.3d 1185, 1187-88 (Ind. Ct. App. 2015), *trans. denied*. "However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination." *Id.* at 1188. Termination of a parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* "Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities." *Id.*

[18] Before an involuntary termination of parental rights may occur, DCS is required to allege and prove, among other things:

> (A) that one (1) of the following is true:
>
> (i) The child has been removed from the parent for at least six (6) months under a dispositional decree[;]
>
> . . . .
>
> (B) that one (1) of the following is true:
>
> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2). DCS's burden of proof for establishing these allegations in termination cases is one of clear and convincing evidence. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1230 (Ind. 2013). If the court finds that the allegations in a petition described in section 4 of this chapter are true, the court shall terminate the parent-child relationship. Ind. Code § 31-35-2-8(a).

[19] When reviewing a termination of parental rights issue, our court will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). We consider "only the evidence and any reasonable inferences therefrom that support the judgment," and give "'due regard' to the trial court's opportunity to judge the credibility of the witnesses firsthand." *K.T.K.,* 989 N.E.2d at 1229. Here, in terminating Mother's parental rights to Child, the juvenile court entered specific findings and conclusions. When a trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *In re R.S.*, 56 N.E.3d at 628. First, we determine whether the evidence supports the

findings, and second, we determine whether the findings support the judgment. *Id*. We will set aside the trial court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.* If the evidence and inferences support the trial court's decision, we must affirm. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*.

[20] In its May 26, 2016 order terminating Mother's parental rights to Child, the juvenile court entered the following pertinent findings of fact, which we paraphrase as follows:

> 8. Throughout the underlying CHINS proceeding, Mother was inconsistent and had no meaningful participation in services. Mother did not comply with either services or dispositional orders, and she has continued to test positive for illegal substances including methamphetamine, amphetamine, marijuana (THC), cocaine, hydrocodone, and ephedrine or some combination thereof. Although Mother had intermittent and inconsistent supervised visitation with Child, Mother had no meaningful or consistent visitation or interaction with Child from June 2015 through May 16, 2016.

> 10. The Family Case Manager, Child's therapist, Mother's therapist, and the CASA believe it would be in the best interest of Child for the court to grant the Petition and to terminate the parent-child relationship. This is due to Mother's inconsistency and lack of participation in any services or efforts toward reunification with Child, her inconsistency in visitation services, the detrimental and harmful impacts to Child from contact and interaction with

Mother, and Mother's ongoing substance use. Adoption is a satisfactory plan for permanency for Child.

*Appellant's App.* at 24-25.

[21] The juvenile court terminated Mother's parental rights, concluding: (1) Child had been removed from the care and custody of Mother and under the terms of a dispositional decree for more than six months; (2) there is a reasonable probability that the continuation of the parent-child relationship between Mother and Child poses a threat to the well-being of Child; (3) there is a reasonable probability that the conditions that resulted in Child's removal from and continued placement outside the care and custody of Mother will not be remedied; (4) termination of Mother's parental rights is in the best interests of Child; and (5) DCS's plan for the care and treatment of Child, that being adoption, is satisfactory. *Id.* at 26.

[22] Mother challenges none of the juvenile court's findings. As a result, Mother has waived any argument relating to whether these unchallenged findings are clearly erroneous. *See McMaster v. McMaster*, 681 N.E.2d 744, 747 (Ind. Ct. App. 1997) (unchallenged trial court findings were accepted as true). Mother also does not dispute that DCS presented sufficient evidence to support the following elements: (1) Child has been removed from parent for at least six months under a dispositional decree pursuant to Indiana Code section 31-35-2-4(b)(2)(A)(i); and (2) there is a satisfactory plan for the care and treatment of Child, i.e., adoption, under Indiana Code section 31-35-2-4(b)(2)(D). Instead, Mother argues that DCS failed to prove by clear and convincing evidence that

conditions that resulted in the removal of Child will not be remedied, that the continuation of the parent-child relationship with Mother poses a threat to Child, and that termination of Mother's parental rights is in Child's best interest.

### *Remediation of Conditions*

[23] Mother first argues that DCS did not meet its burden of proving two of the elements under Indiana Code section 31-35-2-4(b)(2)(B). It is well-settled that because Indiana Code section 31-5-2-4(b)(2)(B) is written in the disjunctive, the juvenile court need find *only one* of the following: (1) the conditions resulting in removal from or continued placement outside the parent's home will not be remedied; (2) the continuation of the parent-child relationship poses a threat to the child; *or* (3) the child has been adjudicated CHINS on two separate occasions. *See In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. Therefore, where the juvenile court determines one of the above-mentioned factors has been proven, and there is sufficient evidence in the record supporting the juvenile court's determination, it is not necessary for DCS to prove, or for the juvenile court to find, any of the other factors listed in Indiana Code section 31-5-2-4(b)(2)(B). *In re S.P.H.*, 806 N.E.2d 874, 882 (Ind. Ct. App. 2004). Accordingly, we focus only on the element of whether the conditions that led to removal and placement outside Mother's care will not be remedied.

[24] In determining whether the conditions that resulted in Child's removal from or continued placement outside Mother's home will not be remedied, we engage

in a two-step analysis. *In re E.M.*, 4 N.E.3d 636, 642-43 (Ind. 2014). First, we identify the conditions that led to removal or continued placement of Child outside Mother's care, and second, we determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* at 643. "In the second step, the trial court must judge a parent's fitness as of the time of the termination proceeding, taking into consideration evidence of changed conditions," that is, balance a parent's recent improvements against "habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation." *Id.* "We entrust that delicate balance to the trial court, which has discretion to weigh a parent's prior history more heavily than efforts made only shortly before termination." *Id.* "Requiring trial courts to give due regard to changed conditions does not preclude them from finding that parents' past behavior is the best predictor of their future behavior." *Id.*

[25] The conditions resulting in Child's removal from or continued placement outside Mother's home included Mother's lack of stable housing, her drug use, and her inability to care for Child. From January 2014 through May 2016, Mother "moved around from place to place," living in various homes, with friends, and occasionally at a local motel. *Id.* at 110-11. During that same time frame, Child was never returned to Mother's care, but lived in four separate foster homes and one treatment facility. Child had a "broken relationship" with Mother, which manifested itself in aggressive behavior. *Id.* at 17-18. Child was transferred from one place to another due to her physical and verbal aggression and her inability to get along with the foster parents or other children

in the home. Child suffered from post-traumatic stress disorder due to violent events that occurred while she was in Mother's care. *Tr.* at 25. Mother's initial visitation with Child was in Mother's home, but that changed because Mother did not have consistent or stable housing. Further, Child's visits in Mother's home were interrupted by intoxicated neighbors and persons unauthorized to be in the home; Mother claimed she could not keep people away. *Id.* at 65. Visits with Mother made Child more susceptible to emotional triggers. *Id.* at 21, 116-17. Initially, Child was shy and would not speak for herself, she had low self-esteem, and her aggressive behavior got her into trouble both at home and at school. Drug use was one of the reasons that Mother was unable to care for Child. However, Mother did not change her behavior. Of the twenty-five random drug screen that Mother participated in, Mother tested positive for illegal drugs in nineteen of them. *Id.* at 73. Mother's most recent positive drug screen was April 8, 2016, one month before the final fact-finding hearing. *Id.* at 126. In January 2016, one month before the first fact-finding hearing, Mother was involved in another CHINS pertaining to her older child, C. The allegations, later substantiated, were that Mother and C. were homeless, Mother was abusing drugs, Mother broke C.'s hand during a fight, and, while in a "kinship placement," C. was seriously burned while making methamphetamine. *Id.* at 124, 127. Royer testified that Mother had made limited positive progress during the CHINS and termination proceedings. *Id.* at 114.

Mother argues that termination of her parental rights is not appropriate because she "has demonstrated that she is not unwilling to cooperate with [DCS]." *Appellant's Br.* at 15. Mother's cooperation, however, is not the question. Instead, this court must determine where the conditions that resulted in Child's removal from or continued placement outside Mother's care will not be remedied. The juvenile court determined that these conditions will not be remedied. From the evidence before us, it was reasonable for the juvenile court to reach that conclusion. Having found that conditions will not be remedied, we need not reach Mother's claim that the continuation of the parent-child relationship poses a threat to Child. *See In re S.P.H.*, 806 N.E.2d at 882 (unnecessary to prove continuation of parental relationship poses threat where evidence is sufficient that conditions will not be remedied).

### Best Interests of Child

Mother next challenges the juvenile court's finding that termination of her parental rights is in Child's best interests. Citing to *Rowlett v. Vanderburgh County Office of Family & Children*, 841 N.E.2d 615, 623 (Ind. Ct. App. 2006), *trans. denied*, Mother argues that stability and permanency cannot be the sole basis for the termination. *Appellant's Br.* at 16. We agree. As our court recently reiterated, "a need for permanency, alone, is not a sufficient basis for terminating parental rights." *In re A.S.*, 17 N.E.3d 994, 1006 (Ind. Ct. App. 2014), *trans. denied*. Here, however, stability and permanency are far from being the sole reasons that the juvenile court terminated Mother's parental rights.

[28] In determining what is in the best interests of a child, the trial court must look beyond the factors identified by DCS to the totality of the evidence. *A.D.S.*, 987 N.E.2d at 1158. In so doing, the court must subordinate the interests of the parents to those of the child. *Id.* The court need not wait until the child is irreversibly harmed before terminating the parent-child relationship. *Id.* "Moreover, we have previously held that the recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *Id.* at 1158-59.

[29] Here, DCS proved that there is a reasonable probability that the circumstances leading to Child's removal from or continued placement outside Mother's care will not be remedied. In its order terminating Mother's parental rights, the juvenile court cited to Mother's lack of participation in reunification services, her inconsistency in visiting Child, her noncompliance with services, the harmful impact that visits with Mother had on Child, and Mother's ongoing use of illegal drugs. *Appellant's App*. at 25. While these factors, alone, could be sufficient to support the termination of Mother's parental rights, the evidence also reveals that Mother made only limited progress toward positive change, she did not have a stable home, she was financially unstable, and Child, who at the time of the hearing was almost twelve years old, asked that visits with Mother be stopped. *Tr*. at 113-14, 116. Moreover, at the time of the fact-finding hearing, Mother was unable to parent Child's older sister, C.

[30] Gaddis reported that Child has a broken relationship with Mother and is suffering from post-traumatic stress disorder as a result of time spent with Mother. *Id*. at 16-18. FCM Scott and Strange testified that Child had been living in her current placement for three months, and she was doing extremely well. *Id*. at 49, 131. Child is friendly, respectful, easy to get along with, and is well mannered in public. *Id*. at 131. Child does well in school and plays softball two times a week. *Id*. at 132. Child is included in family trips and loves the Strange family, they love her, and she hopes they can adopt her. *Id*. at 132, 138, 139. Therapist Baumgartner testified that Child is doing well in her foster home and gets the support that she will need as she continues in therapy to delve deeper into her memories. *Id*. at 95-98. The CASA testified that Child is a "very different person" in her current home; she is outgoing, talkative, and cheerful. *Id*. at 142. Further, Gaddis, Baumgartner, Royer, and the CASA all testified that it would be in Child's best interests for Mother's parental rights to be terminated. *Id*. at 32, 102, 119-20, 142. The trial court did not err in its determination that termination of Mother's parental rights is in Child's best interests.

[31] We will reverse a termination of parental rights only upon a showing of "clear error" – that which leaves us with a definite and firm conviction that a mistake has been made. *In re A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997). Based on the record before us, we cannot say that the juvenile court's termination of Mother's parental rights to Child was clearly erroneous. We, therefore, affirm the juvenile court's judgment.

[32] Affirmed.

[33] Robb, J., and Barnes, J., concur.