# MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 28 2018, 9:16 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT (M.F.)

Ernest P. Galos
South Bend, Indiana

ATTORNEY FOR APPELLANT (C.D.)

Mark F. James
Anderson, Agostino & Keller, P.C.
South Bend, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Abigail R. Recker
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of L.T., J.T., Ju.D., B.D., Ja.D., and A.D. (Minor Children) and<br><br>M.F. (Mother) and C.D. (Father),<br>*Appellants-Respondents,*<br><br>v.<br><br>Indiana Department of Child Services,<br>*Appellee-Petitioner* | February 28, 2018<br><br>Court of Appeals Case No. 71A03-1708-JT-1866<br><br>Appeal from the St. Joseph Probate Court<br><br>The Honorable James N. Fox, Judge<br><br>Trial Court Cause Nos.<br>71J01-1610-JT-70<br>71J01-1610-JT-71<br>71J01-1610-JT-72<br>71J01-1610-JT-73<br>71J01-1610-JT-74<br>71J01-1610-JT-75 |

**Vaidik, Chief Judge.**

# Case Summary

M.F. ("Mother") and C.D. ("Father") appeal the termination of their parental rights. Finding no error, we affirm.

# Facts and Procedural History

Mother is the natural mother of six children: L.T., born in 2007; J.T., born in 2008; Ju.D., born in 2010; B.D., born in 2011; Ja.D, born in 2013; and A.D., born in 2015. Father, who is Mother's uncle, is the natural father of the four youngest children.[1] What follows is taken primarily from the trial court's findings of fact, none of which are challenged by either Mother or Father.

In July 2015, the Department of Child Services ("DCS") received an abuse-and-neglect report regarding the condition of the family home. DCS investigated and found the home "to be cluttered with laundry, canned food, and kitchen items piled on the floor, that several live cockroaches were observed in the kitchen, that bug killing powder was observed in the kitchen in reach of the children[.]" Appellants' App. Vol. II p. 76. In addition, "the five (5) oldest children did not have beds but were made to sleep on pallets" because,

---

[1] D.T. is the natural father of L.T. and J.T. The trial court also terminated his parental rights, but he is not involved in this appeal.

according to Mother, "they urinate themselves." *Id.* Mother and Father admitted that B.D., who was three at the time, had "buzzed" her own hair and "ate soiled tissues from the toilet." *Id.* J.T. had been diagnosed with ADHD and oppositional defiant disorder but was not taking any medication. Father "admitted to struggling with paranoia and had been diagnosed with anxiety, ADHD, and bipolar disorder," and he had hallucinations. *Id.* During the investigation, the family moved "due to mold in the home," but their new home "was infested with fleas." *Id.* "Ongoing supervision concerns persisted with the children; the children were observed playing with glass and one was nearly hit by a car." *Id.*

[4] In August 2015, while the initial investigation was still in progress, DCS received a report that Mother and Father had been arrested after leaving A.D., who was only a few months old, in a parked car at a Walmart. This prompted DCS to take custody of the children. "[T]he children had previously been removed from Mother and [Father's] care while residing in the State of Utah, due to unsanitary home conditions and a lack of supervision of the children." *Id.* DCS filed petitions alleging that the children were in need of services ("CHINS"), which Mother and Father eventually admitted.

[5] Mother and Father completed psychological parenting assessments in the fall of 2015. Mother was diagnosed with "compulsive personality disorder with narcissistic features, which manifests itself in rigid thinking, defensiveness, and a lack of empathy," and psychotherapy was recommended. *Id.* at 79. Mother attended therapy, but she "failed to develop and implement parenting skills,

struggled with empathy, nurture, consistency, and maintaining realistic expectations of the children." *Id*. She also "failed to understand and acknowledge the confusion her incestuous relationship could have on her sexually reactive children." *Id*. She "asked for guidance from her therapist, but failed to follow through on the advice and engag[ed] in arguments." *Id*.

[6] The assessment of Father's parenting dynamics "revealed alarming scores and [an] admission that his child, [A.D.], does not reinforce him as a parent and is not sufficiently adaptable, resulting in feelings of depression." *Id*. He was diagnosed with a major mood disorder, major depression, and ADHD, and psychotherapy was recommended. He participated in therapy and "made some progress," but the therapy "did not include any outside stressors, such as parenting multiple children," and "improvement in his parenting skills [was] not observed during visitation." *Id*. In January 2016, Father's visitation was temporarily suspended due to an admission of homicidal and suicidal thoughts.

[7] A primary concern was the sexualized behavior of the children. Mother admitted that L.T., J.T., and Ju.D. "engaged in inappropriate touching prior to DCS involvement, while in the care of [Mother] and [Father]." *Id*. at 77. While the CHINS case was pending, "an incident occurred in which [J.T.] gave [L.T.] hickeys" on his neck. *Id*. DCS family case manager ("FCM") Renaldo Wilmoth attended a visitation between Mother and the children during which the hickeys were visible, but Mother didn't address the issue with the children. L.T. and J.T. also made various disclosures of a sexual nature. L.T. reported that Mother and Father had sex in his presence, and J.T. "disclosed a lack of

supervision in Mother's home and inappropriate sexual touching amongst her, [L.T.], and a younger brother." *Id.* J.T. also reported that she had viewed pornographic material on a computer in Mother's home. "The children require constant supervision in order to be placed safely in the same home," but L.T. and J.T. both "identified [L.T.] as the primary caregiver when they resided with Mother and [Father]." *Id.* "Given the sexual reactivity among siblings, [L.T.] and [J.T.] require the modeling of healthy, appropriate sexual relationships," but "observing an incestuous relationship such as that of Mother and [Father] would, at best, serve to confuse the children." *Id.*[2] Despite knowing of the children's sexualized behavior, Mother and Father did not get any of them into therapy to address the issue. L.T. and J.T.'s therapist "credibly testified" that Mother is unable "to provide the high level of structure and supervision that [L.T.] and [J.T.] require." *Id.* at 78.

[8] "[B.D.] exhibits aggressive and sexualized behavior, including a disregard for personal space and inappropriate physical affection." *Id.* She kissed an unknown child during one supervised visit, and neither Mother nor Father noticed. At another visit, Mother did not notice that B.D., J.T., and Ju.D. were kissing each other in a playhouse. The children were also seen "grabbing one another's private parts" during Mother and Father's supervised visits. *Id.*

---

[2] In Indiana, sex between an uncle (here, Father) and a niece (here, Mother) constitutes incest, a Level 5 felony. Ind. Code § 35-46-1-3.

Eventually, a "no touching" rule was put into place during visitations, but Mother and Father failed to consistently enforce the policy.

[9] In addition to the sexual issues, Ju.D and B.D. "have been diagnosed with post-traumatic stress disorder, express fear of being left alone, and exhibit great attachment to their foster parents and school staff." *Id.* "Mother and [Father's] struggle to adequately supervise the children prohibits them from meeting [Ju.D.] and [B.D.'s] needs." *Id.*

[10] The majority of Mother's and Father's visits with the children "were characterized by failures to adequately supervise, re-direct, provide structure," whether Mother and Father visited together or separately. *Id.* "Mother and [Father] completed a parenting class, but failed to consistently apply the techniques learned in class." *Id.* "Despite repeated redirection from service providers, Mother and [Father] were unable to position themselves [where] all children could be seen." *Id.* "Mother and [Father's] inability to adequately supervise all of the children, even in an enclosed area, puts all of the children at risk." *Id.* Visitation with Mother and Father caused "significant behavioral problems" for the children. *Id.* "The children frequently expressed refusal to attend visits and acted out during and after visits," and at times the children's behavior after visits "escalated to such extremes" that the visitation supervisor needed to pull over on the highway. *Id.*

[11] The trial court appointed Pam and Noel Wycliff as court-appointed special advocates ("CASAs") for the children. Pam Wycliff "offered services to

Mother and [Father] due to difficulties they had experienced with home conditions and transportation," but they "failed to follow through with initiating the service." *Id*. at 79. Mrs. Wycliff believed that Mother and Father "were not able to demonstrate adequate supervision over the children." *Id*. During one visit to a park, Mother left Ju.D. in a bathroom and didn't realize it until she was asked three times how many children she had with her.

[12] In October 2016, DCS filed petitions to terminate Mother's and Father's parental rights, with the plan for the future care of the children being adoption. "Despite over one year of offered services, Mother and [Father] were unable to progress to any visit supervision less restrictive than fully supervised," *id*. at 79, and in December 2016, their visitation was suspended. However, sibling visitation continued, and the children's behavior during visits and transport "greatly improved." *Id*. at 78. Marked improvement in Ju.D. and B.D.'s "acting out" behavior was observed, and displays of sexualized behavior "drastically decreased." *Id*. at 79. L.T., Ja.D., and A.D. thrived in their placements. J.T. "struggled" in her placement even after parental visitation was suspended, but her behavior "further escalated after seeing Mother at a medical appointment post-visit suspension." *Id*. Mother responded to the suspension of visitation by withholding consent to J.T. being given an ADHD medication that had been recommended by a doctor.

[13] The trial court held a hearing on the termination petitions in April 2016. Among DCS's witnesses were FCM Wilmoth and the two CASAs, all of whom testified that termination is in the best interests of the children. Mother and

Father testified that they were living in an "appropriate and affordable" new home, but Mother "admitted that they are already behind on their mortgage, despite financial assistance from DCS." *Id*. at 79. They lived at four addresses in twenty months while the CHINS and termination cases were pending.

[14] After the hearing, the trial court issued an order granting DCS's petitions, reaching the following conclusions under the termination statute, Indiana Code section 31-35-2-4: (1) the children have been removed from the parents for at least six months under a dispositional decree; (2) there is a reasonable probability that the conditions that resulted in the children's removal will not be remedied and that continuation of the parent-child relationship poses a threat to the well-being of the children; (3) termination is in the best interests of the children; and (4) the plan of adoption of the children is satisfactory.

[15] Mother and Father now appeal.

# Discussion and Decision

[16] In a termination case, the trial court must make conclusions regarding the allegations in the termination petition, and it must enter findings of fact in support of those conclusions. Ind. Code § 31-35-2-8. When the losing party appeals, the role of the appellate court is to determine whether the evidence supports the findings and whether the findings support the conclusions. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). We will set aside a termination judgment only if it is clearly erroneous. *Id*.

[17]   Here, Mother and Father do not challenge any of the trial court's ninety-eight findings of fact. Nor do they challenge the trial court's first and last conclusions: that the children have been removed from the parents for at least six months under a dispositional decree and that the plan of adoption of the children is satisfactory. Therefore, we need only decide whether the trial court's findings support its conclusions that there is a reasonable probability that the conditions that resulted in the children's removal will not be remedied and that termination is in the best interests of the children. We hold that they do.[3]

[18]   Numerous findings of fact support the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the children's removal—lack of safe and stable housing and lack of supervision—will not be remedied. Even after the children were removed in Utah "due to unsanitary home conditions and a lack of supervision," Mother and Father allowed their home in Indiana to become so filthy that it prompted a DCS investigation. That investigation revealed a continuing lack of supervision, with children eating tissues out of the toilet, playing with glass, and nearly getting hit by a car. One child, J.T., was not taking any medication after being diagnosed with

---

[3] Because we affirm the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the children's removal will not be remedied, we do not address its alternate conclusion that there is a reasonable probability that continuation of the parent-child relationship poses a threat to the well-being of the children. *See In re I.A.*, 934 N.E.2d 1127, 1133 (Ind. 2010) ("We first observe that [Indiana Code] section 31-35-2-4(b)(2)(B) is written in the disjunctive. Thus DCS was required to prove by clear and convincing evidence only one of the two requirements of subsection (B).").

ADHD and oppositional defiant disorder. Then, in August 2015, while the initial investigation was still in progress, Mother and Father were arrested after leaving A.D., an infant, in a parked car at a Walmart.

After being diagnosed with significant mental-health disorders, Mother and Father began seeing therapists, but the things they learned and the progress they made were not implemented in their visits with the children. Perhaps most troublesome is Mother's failure to "understand and acknowledge the confusion her incestuous relationship could have on her sexually reactive children." At one point, Father's visitation was suspended after he admitted to having homicidal and suicidal thoughts.

The trial court also found that the children are in need of close supervision and that Mother and Father have simply failed to demonstrate an ability to provide that supervision. At various visits, Mother did not address the fact that L.T. had hickeys on his neck (which had been given to him by J.T.), Mother and Father did not notice that B.D. kissed an unknown child, and Mother did not notice that B.D., J.T., and Ju.D. were kissing each other. During some visits, the children were seen "grabbing one another's private parts." A "no touching" rule was eventually put into place, but Mother and Father failed to consistently enforce it. Furthermore, despite knowing of the children's sexualized behavior, Mother and Father did not get any of them into therapy to address the issue. And despite guidance from service providers, Mother and Father failed to position themselves where all children could be seen during visitation. Visits with Mother and Father also caused "significant behavioral problems" for the

children. After more than a year of services, Mother and Father still had not progressed beyond fully supervised visitation, and their visitation eventually had to be suspended. Apparently in retaliation for the suspension, Mother withheld consent to J.T. being given a doctor-recommended ADHD medication. Notably, sibling visitation continued after the suspension, and the children's behavior during visits and transport "greatly improved." Ju.D. and B.D. acted out less, and displays of sexualized behavior "drastically decreased."

[21] The trial court's findings also support a conclusion that stable housing will continue to be a concern. Mother and Father lived at four addresses in twenty months while the CHINS and termination cases were pending. One of the CASAs offered services to Mother and Father relating to home conditions and transportation, but they did not follow through with initiating the service. In addition, by the time of trial, Mother and Father were behind on the mortgage on their new home despite financial assistance from DCS.

[22] In light of all these findings, we cannot say that the trial court erred, clearly or otherwise, by concluding that there is a reasonable probability that the conditions that led to the removal of the children will not be remedied.

[23] We also affirm the trial court's conclusion that termination is in the best interests of the children. "[T]he recommendation by both the case manager and child advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests."

*In re A.D.S.*, 987 N.E.2d 1150, 1158-59 (Ind. Ct. App. 2013), *trans. denied*. Here, we have addressed the substantial evidence that the conditions resulting in removal probably will not be remedied, and FCM Wilmoth and both CASAs all recommended termination. As such, we will not disturb the trial court's best-interests determination.

[24] Affirmed.

May, J., and Altice, J., concur.