FILED

Sep 26 2019, 8:42 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT, A.B.

Leanna Weissmann
Lawrenceburg, Indiana


ATTORNEY FOR APPELLANT, J.R.

Kimberly A. Jackson
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

David E. Corey
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re: the Termination of the
Parent-Child Relationship of:
K.R., J.T.R., J.L.R., & E.R.
(Minor Children);

A.B. (Mother) and J.R. (Father),

*Appellants-Respondents,*

v.

The Indiana Department of
Child Services,

*Appellee-Petitioner.*

September 26, 2019

Court of Appeals Case No.
19A-JT-487

Appeal from the Steuben Circuit
Court

The Honorable Allen N. Wheat,
Judge

Trial Court Cause Nos.
76C01-1807-JT-234
76C01-1807-JT-235
76C01-1807-JT-236
76C01-1807-JT-237

**Pyle, Judge.**

# Statement of the Case

[1] A.B. ("Mother") and J.R. ("Father") (collectively "Parents") each appeal the termination of the parent-child relationship with their children J.L.R. ("J.L.R."), E.R. ("E.R."), J.T.R. ("J.T.R.") and K.R. ("K.R.") (collectively "the Children"). Parents argue that the trial court abused its discretion in admitting their drug test results into evidence and that there is insufficient evidence to support the terminations. Regarding the sufficiency of the evidence, Parents argue that the Department of Child Services ("DCS") failed to prove by clear and convincing evidence that there is a reasonable probability that the conditions that resulted in the Children's removal or the reasons for placement outside the home will not be remedied. Mother also argues that DCS failed to prove by clear and convincing evidence that the termination of the parent-child relationships is in the Children's best interests and that there is a satisfactory plan for the care and treatment of the Children. Concluding that the trial court did not abuse its discretion in admitting evidence and that there is sufficient evidence to support the termination of the parent-child relationships, we affirm the trial court's judgment.

[2] We affirm.

# Issues

1. Whether the trial court abused its discretion in admitting Parents' drug test results into evidence.

> 2. Whether there is sufficient evidence to support the terminations.

# Facts

The evidence and reasonable inferences to be drawn therefrom that support the judgment reveal that Mother and Father are the parents of K.R., who was born in June 2004; J.T.R., who was born in in May 2008; E.R., who was born in December 2010; and J.L.R., who was born in March 2013. In April 2017, DCS removed the Children from Parents' home because of conditions in the home and domestic violence. One week later, the Children were returned to the home for a trial visit. At this time, Father was incarcerated. After Mother had a positive drug test, DCS removed the Children from the home again in May 2017 and placed them in foster care.

The trial court subsequently adjudicated the Children to be children in need of services ("CHINS"). In September 2017, following the CHINS adjudication, the trial court ordered Parents to: (1) maintain suitable and safe housing; (2) secure and maintain a legal and stable source of income; (3) submit to random drug screens; (4) complete parenting assessments and successfully complete all recommendations; (5) complete psychological evaluations and successfully complete all recommendations; (6) complete substance abuse assessments and successfully complete all recommendations; and (7) abstain from the use of illegal controlled substances.

[5]     In July 2018, DCS filed petitions to terminate the parent-child relationships. Testimony at the January 2019 termination hearing revealed that although Parents had participated in the court-ordered assessments, Parents had failed to successfully complete any of the court-ordered programs. In addition, Parents, who were living with Mother's brother and his family at the time of the termination hearing, did not have stable housing to accommodate the Children. Mother's brother, who had recently lost his job, also housed his girlfriend and his five children. Further, although Mother was employed at the time of the hearing, her employment throughout the proceedings had been sporadic. In addition, the testimony revealed that during the course of the proceedings, Parents had never progressed to unsupervised visitation with the Children.

[6]     Also during the hearing, the trial court admitted Parents' drug test results over Parents' objections. (State's Exhibits 30 (Father's Test Results) and 31 (Mother's Test Results)). Each exhibit included a total of nearly sixty pages of Parents' consents and drug testing results. The trial court admitted these exhibits during the telephonic testimony of Bridget Lemberg ("Lemberg"), lab director and custodian of the records at Forensic Fluids Laboratories ("Forensic Fluids") in Michigan. Forensic Fluids is licensed by the Michigan State Department of Health with CLIA certification by the Federal Department of Health and Human Services. Each exhibit was also accompanied by Lemberg's sworn affidavit, which provided that in her capacity as lab director, she was "familiar with the procedures employed to ensure the chain of custody of samples, the testing of those samples, and the validity of the test procedures

employed by [the] laboratory." (State's Ex. 30 and 31 at 54). Lemberg also set forth in detail the laboratory's procedures and affirmed that all of the procedures had been followed when testing Parents' submitted samples. Lemberg's affidavit further explained that the laboratory reports set forth in the exhibits had been "maintained in the normal course of business activity as [] business record[s]." (State's Exs. 30 and 31 at 55).

[7] According to the drug test results, Mother tested positive for amphetamine and methamphetamine in August, September, and October 2018 after the termination petitions had been filed. Mother also submitted to a drug test the day of the termination hearing, and the results of that test were also positive for methamphetamine. In addition, Mother testified at the termination hearing that she had used methamphetamine in August, September, and October 2018 and that she had no reason to believe that the positive drug test results from that period were inaccurate. Mother also admitted that she had not completed any of the court-ordered services and that she had never progressed to unsupervised visitation.

[8] Father also testified that he had used methamphetamine, amphetamine, and marijuana in August, September, and October 2018 and did not dispute the positive drug test results from that time period. Father admitted that he had used illegal drugs "probably all [his] life" and believed that it would be appropriate for his children to live with him even though he continued to use drugs because, according to him, his drug use did not affect the Children. (Tr. Vol. 2 at 142). He also testified that he was in "a little bit worse" of a place to

have the Children living with him than he was when they were removed twenty months before the hearing because he did not "have [his] own, [his] own place for 'em." (Tr. Vol. 2 at 144). The evidence also revealed that Father had two pending charges for dealing methamphetamine as Level 2 and 4 felonies. According to Father, he thought that he would be convicted of the Level 4 charge but not the Level 2 one.

[9] Also at the hearing, former DCS Family Case Manager Tennille Evers ("FCM Evers"), who had been the family's case manager from November 2016 until October 2018, testified that during that time period, Parents had not "progress[ed] . . . in any meaningful way in terms of improving their overall situation relative to uh the reason that they ha[d] involvement at the DCS." (Tr. Vol. 2 at 165). Specifically, FCM Evers explained that Parents' "drug issues [had] continued. Their domestic violence issues [had] continued. Their housing situation was unstable at best." (Tr. Vol. 2 at 165). DCS FCM Justin Kuhnle, who had been the family's case manager since November 2018, testified that the four children were in foster care and that the plan for them was adoption.

[10] Therapist Suzanne Poe ("Therapist Poe"), who supervised the visits between Parents and the Children, testified that based on her observations during the visits, she would have concerns for the Children's safety if they were placed in a home with Father. Specifically, Therapist Poe explained that she was concerned about the way Father had interacted with Mother and the things that she had heard Father say to Mother. She was also concerned about the anger

that she had seen him display toward Mother and his inability to calm down. Therapist Poe was particularly concerned about "the mental and emotional state of the children should they witness such interactions between their parents." (Tr. Vol. 3 at 38).

Following the hearing, the trial court issued an order terminating the parental relationships between Parents and their four children. Each parent separately appeals the terminations.

# Decision

Parents contend that: (1) the trial court abused its discretion in admitting their drug test results into evidence and (2) there is insufficient evidence to support the terminations. We address each of their contentions in turn.

## 1. Admission of Evidence

Parents argue that the trial court abused its discretion in admitting Exhibits 30 and 31, their drug test results, into evidence over their objections. Parents specifically contend that the test results were hearsay. DCS responds that the test results were admissible pursuant to the records of regularly conducted activity exception, which was previously referred to as the business records exception, to the hearsay rule. We agree with DCS.

The admission of evidence is left to the sound discretion of the trial court, and we will not reverse that decision except for an abuse of discretion. *In re Involuntary Termination of the Parent Child Relationship of A.H.,* 832 N.E.2d 563, 567 (Ind. Ct. App. 2005). An abuse of discretion occurs when the trial court's

decision is against the logic and effect of the facts and circumstances before it. *Id*.

[15] Hearsay is an out-of-court statement offered in evidence to prove the truth of the matter asserted. Ind. Evidence Rule 802(c). Hearsay is not admissible unless is falls under certain exceptions. Evid. R. 802. One such exception is that of records of a regularly conducted activity. Specifically, Evid. R. 803(6) provides that such records are admissible if:

> (A) the record was made at or near the time by – or from information transmitted by – someone with knowledge;
>
> (B) the record was kept in the course of a regularly conducted activity of a business, organization, occupation, or calling, whether or not for profit;
>
> (C) making the record was a regular practice of that activity;
>
> (D) all these conditions are shown by the testimony of the custodian or another qualified witness, or by a certification that complies with Rule 902(11) or (12) [the rule on self-authentication] or with a statute permitting certification; and
>
> (E) neither the source of the information nor the method or circumstances of preparation indicated a lack of trustworthiness.

This hearsay exception is grounded on the theory that records of regularly conducted activity are reliable because they can be checked systematically. *Stahl v. State*, 686 N.E.2d 89, 92 (Ind. 1997).

[16] The Indiana Supreme Court has explained as follows regarding this rule:

The business records exception to the hearsay rule is based on the fact that the circumstances of preparation assure the accuracy and reliability of the entries. As we have observed more recently, the reliability of business records stems in part from the fact that the organization depends on them to operate, from the sense that they are subject to review, audit, or internal checks, [and] from the precision engendered by the repetition[.]

In essence, the basis for the business records exception is that reliability is assured because the maker of the record relies on the record in the ordinary course of business activities. The 'regular course' of business 'must find its meaning in the inherent nature of the business in question and in the methods systematically employed for the conduct of the business as a business.' Thus where a company does not rely upon certain records for the performance of its function those records are not business records within the meaning of the exception to the hearsay rule[.] It is not enough to qualify under the business records exception to show that the records are made regularly, rather, the court must also look to 'the character of the records and their earmarks of reliability acquired from their source and origin and the nature of the compilation.'

*Termination of Parent-Child Relationship of E.T.*, 808 N.E.2d 639, 642-43 (Ind. 2004) (citations omitted).

[17] Here, Parents specifically argue that their drug test results do not fit into the business records exception to the hearsay rule. In support of their argument, they direct us to *Matter of L.S.*, 125 N.E.3d 628 (Ind. Ct. App. 2019), wherein another panel of this Court held that the exhibits that contained a mother's Forensic Fluids' drug test results did not fall under the business records exception to the rule against hearsay. *Id.* at 634. Specifically, that panel

explained that although Lemberg's affidavits explained that the laboratory reports had been maintained in the normal course of business activity as business records, the panel also had to consider whether Forensic Fluids had depended on those records to operate or to conduct business. *Id.* After considering this issue, the panel determined that Forensic Fluids had not depended on drug test results to operate or to conduct business. *Id.* Rather, the panel concluded that the drug test results had been documented for the benefit of DCS and were, therefore, not admissible under the business records exception to the hearsay rule. *Id.*

[18] In support of its decision, the panel cited *E.T.*, 808 N.E.2d at 645, wherein the Indiana Supreme Court held that reports of SCAN's ("SCAN")[1] home visits and supervised visitations did not fit into the business records exception to the hearsay rule. Specifically, the Indiana Supreme Court explained that the reports included third-party statements concerning events not observed by SCAN's staff members as well as conclusory lay opinions. *Id.* at 643, 644. The Supreme Court further pointed out that the reports appeared to have been compiled for the sole benefit of DCS, and that, in fact, the only clients of this particular SCAN program were those referred by DCS. *Id.* at 644-45. In addition, there was nothing in the record that supported the view that the reports had been prepared for the systematic conduct of SCAN as a non-profit

---

[1] SCAN, Inc. is a non-profit corporation whose mission is to "prevent child abuse and neglect through direct service, education, coordination and advocacy." *E.T.*, 808 N.E.2d at 640-41.

corporation. *Id.* at 645. In fact, a survey of Indiana cases revealed that nothing similar to the SCAN reports had ever been included by our courts within the business records exception. *Id.* Rather, cases from the Indiana Supreme Court and Court of Appeals revealed that evidence held as admissible included blood alcohol test results (*Reeves v. Boyd & Sons*, 654 N.E.2d 864 (Ind. Ct. App. 1995)) as well as blood and DNA results (*Fowler v. Napier,* 663 N.E.2d 1197 (Ind. Ct. App. 1996); *Humbert v. Smith*, 655 N.E.2d 602 (Ind. Ct. App. 1995); *Burp v. State*, 612 N.E.2d 169 (Ind. Ct. App. 1993)). *E.T.*, 808 N.E.2d at 645 n.4 (and cases cited therein). Further, unlike documents traditionally allowed under the business records exception, the SCAN reports "appear[ed] to be substantive end products of a service offered by SCAN, Inc. solely for an external governmental agency, to become the permanent property of that agency." *Id.* In sum, the Indiana Supreme Court held that the SCAN reports did not qualify as business records. *Id.*

[19] Our review of the facts in *E.T.* reveals that they are distinguishable from the facts before us. Specifically, Forensic Fluids functions independently from any law enforcement body or state agency. Rather, its services are presumably available to any person, public or private, corporate or individual, who wishes to pay the lab fees. In addition, the chemical analyses performed at Forensic Fluids appear to be routine procedures, done for whomever requests them. These facts distinguish the SCAN reports on *E.T.* from the drug test results in this case and leads us to disagree with the result in *L.S.* Accordingly, we

conclude that drug test results do indeed fit into the business records exception to the hearsay rule.

[20] This conclusion is consistent with the results reached in other jurisdictions. *See In the Matter of S.D.J.*, 665 S.E.2d 818, 822 (N.C. Ct. App. 2008) (explaining that blood test results are records made in the usually course of business); *J.G. v. State*, 685 So.2d 1385, 1385 (Fla. Dist. Ct. App. 1997) (holding that the trial court did not err in admitting drug test reports under the business records exception to the hearsay rule); *Montoya v. State*, 832 S.W.2d 138, 141 (Tex. App. 1992) (holding that the trial court did not abuse its discretion in admitting drug test result into evidence pursuant to the business record exception to the hearsay rule); *Commonwealth of Pennsylvania v. Kravontka*, 558 A.2d 865, 871 (Pa. Super. Ct. 1989) (holding that there was "no question that [Kravontka's blood alcohol test results were] properly admitted into evidence pursuant to the business records exception to the hearsay rule).

[21] We further note that even if we had concluded that the trial court had improperly admitted the Parents' drug test results, any such error was harmless because the remaining evidence presented at the termination hearing, as discussed below, was more than sufficient to support the termination of Parents' parental rights.[2] *See E.T.*, 808 at 646 (explaining that the improper admission of

---

[2] Parents also argue that the trial court abused its discretion in admitting the test results because: (1) the tests were not administered in accordance with proper protocol; (2) "Lemberg's affidavit appears to have been drafted, at least in part, to certify a single drug test, not the 40 drug tests referenced in documents attached to each affidavit;"

evidence is harmless error when the judgment is supported by substantial independent evidence to satisfy the reviewing court that there is no substantial likelihood that the questioned evidence contributed to the judgment).

## 2. Sufficiency of the Evidence

[22] Parents argue that there is insufficient evidence to support the terminations. The traditional right of parents to establish a home and raise their children is protected by the Fourteenth Amendment to the United States Constitution. *In re J.W., Jr.*, 27 N.E.3d 1185, 1187-88 (Ind. Ct. App. 2015), *trans. denied*. However, a trial court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding a termination. *Id.* at 1188. Termination of the parent-child relationship is proper where a child's emotional and physical development is threatened. *Id.* Although the right to raise one's own child should not be terminated solely because there is a better home available for the child, parental rights may be terminated when a parent is unable or unwilling to meet his or her parental responsibilities. *Id.*

[23] Before an involuntary termination of parental rights may occur, DCS is required to allege and prove, among other things:

> (B) that one (1) of the following is true:

---

(Father's Br. at 29) and (3) DCS failed to establish a proper chain of custody. We also reject these arguments because any error in the admission of the test results would be harmless error.

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;
>
> (C) that termination is in the best interests of the child; and
>
> (D) that there is a satisfactory plan for the care and treatment of the child.

IND. CODE § 31-35-2-4(b)(2). DCS must prove the alleged circumstances by clear and convincing evidence. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1230 (Ind. 2013).

[24] When reviewing a termination of parental rights, this Court will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). We consider only the evidence and any reasonable inferences to be drawn therefrom that support the judgment and give due regard to the trial court's opportunity to judge the credibility of the witnesses firsthand. *K.T.K.*, 989 N.E.2d at 1229.

[25] When the trial court's judgment contains specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *In re R.S.*, 56 N.E.3d at 628. First, we determine whether the evidence supports the findings, and second, we determine whether the findings support the judgment. *Id.* We

will set aside a trial court's judgment terminating a parent-child relationship only if it is clearly erroneous. *Id.* Findings are clearly erroneous only when the record contains no facts or inferences to be drawn therefrom that support them. *In re A.G.*, 6 N.E.3d 952, 957 (Ind. Ct. App. 2014). A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment. *Id.*

[26] Mother and Father both argue that DCS failed to prove by clear and convincing evidence that there is a reasonable probability that the conditions that resulted in the Children's removal or the reasons for placement outside the home will not be remedied. In determining whether the conditions that resulted in a child's removal or placement outside the home will not be remedied, we engage in a two-step analysis. *In re E.M.,* 4 N.E.3d 636, 643 (Ind. 2014). We first identify the conditions that led to removal or placement outside the home and then determine whether there is a reasonable probability that those conditions will not be remedied. *Id.* The second step requires trial courts to judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions and balancing any recent improvements against habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id.* Habitual conduct may include parents' prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and a lack of adequate housing and employment. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1157 (Ind. Ct. App. 2013), *trans. denied*. The trial court may also consider services

offered to the parent by DCS and the parent's response to those services as evidence of whether conditions will be remedied. *Id.*

[27] Here, our review of the evidence reveals that the Children were removed from Parents because of conditions in the home, domestic violence, and drug use. Evidence at the termination hearing revealed that Mother and Father have not provided suitable housing for the Children. Specifically, at the time of the hearing, Parents were living with Mother's brother, who had recently lost his job and who also housed his girlfriend and his five children. In addition, Parents admitted that they had continued to use methamphetamine throughout the proceedings and even after the termination petitions had been filed. Father did not believe that his drug use affected the Children even though he had two pending felony charges for dealing methamphetamine. Further, neither parent had completed any of the court-ordered programs. FCM Evers testified that the conditions that had resulted in the Children's removal had not been remedied because the drug and domestic violence issues continued and the family's housing situation was unstable. This evidence supports the trial court's conclusion that there was a reasonable probability that the conditions that resulted in the Children's removal would not be remedied. We find no error.

[28] Mother also argues that there is insufficient evidence that the termination was in the Children's best interests. In determining whether termination of parental rights is in the best interests of a child, the trial court is required to look at the totality of the evidence. *In re D.D.*, 804 N.E.2d 258, 267 (Ind. Ct. App. 2004), *trans. denied*. In so doing, the court must subordinate the interests of the parents

to those of the child involved. *Id.* Termination of the parent-child relationship is proper where the child's emotional and physical development is threatened. *In re R.S.*, 774 N.E.2d 927, 930 (Ind. Ct. App. 2002), *trans. denied*. "'A parent's historical inability to provide adequate housing, stability and supervision coupled with a current inability to provide the same will support a finding that continuation of the parent-child relationship is contrary to the child's best interest.'" *In re B.D.J.*, 728 N.E.2d 195, 203 (Ind. Ct. App. 2000) (quoting *Matter of Adoption of D.V.H.*, 604 N.E.2d 634, 638 (Ind. Ct. App. 1992), *trans. denied, superceded by rule on other grounds*). Here, our review of the evidence reveals that Mother and Father have historically been unable to provide housing, stability, and supervision for the Children. Further, testimony at the termination hearing revealed that they were unable to provide the same at the time of the hearing. Mother's argument therefore fails, and there is sufficient evidence that termination is in the Children's best interests.

[29] Last, Mother argues that DCS does not have a satisfactory plan for the Children's care and treatment. This Court has previously explained that the plan for the care and treatment of the child need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent-child relationship is terminated. *In re L.B.*, 889 N.E.2d 326, 341 (Ind. Ct. App. 2008). Here, the DCS caseworker testified the plan for the care and treatment of the Children is adoption. This is a satisfactory plan. *See In re A.N.J.,* 690 N.E.2d 716, 722 (Ind. Ct. App. 1997).

Affirmed.

Robb, J., concur in result.

Mathias, J., concur.