## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Sep 30 2019, 10:25 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

David W. Stone IV
Anderson, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Termination of the Parent-Child Relationship of:<br><br>Chl.M. and Cha.M. (Minor Children)<br><br>And<br><br>C.M. (Father),<br><br>*Appellant-Respondent,*<br><br>v.<br><br>Indiana Department of Child Services,<br><br>*Appellee-Petitioner.* | September 30, 2019<br><br>Court of Appeals Case No. 19A-JT-784<br><br>Appeal from the Madison Circuit Court<br><br>The Honorable George Pancol, Judge<br><br>Trial Court Cause No. 48C02-1807-JT-136 and 48C02-1807-JT-137 |

**Altice, Judge.**

## Case Summary

[1] C.M. (Father) appeals from the involuntary termination of his parental rights to his daughters, Chl.M. and Cha.M. (collectively, the Children). On appeal, Father argues that the Indiana Department of Child Services (DCS) failed to present sufficient evidence to support the trial court's conclusion that there is no reasonable probability that the conditions that resulted in the Children's removal and continued placement outside Father's care and custody will be remedied.

[2] We affirm.

## Facts & Procedural History

[3] H.Z. (Mother) and Father (collectively, the Parents) have two children together, Chl.M. (born in August 2011) and Cha.M. (born in April 2014).[1] DCS first became involved with the family about a month after Cha.M.'s birth. The Children were adjudicated CHINS on May 21, 2014, and the Parents were ordered to participate in services, including random drug screens and substance abuse evaluations. The CHINS case was dismissed on December 24, 2014, due to the Parents' compliance with the dispositional order and negative drug tests.

---

[1] Mother voluntarily surrendered her parental rights during the termination proceedings and, therefore, does not participate in this appeal. Accordingly, our recitation of the facts will focus on those related to Father.

[4] In August 2016, DCS received a report of abuse or neglect of the Children. A DCS family case manager (FCM) investigated the report on August 6, 2016, and drug screens for both of the Parents came back positive for cocaine. On August 12, 2016, Father admitted to having smoked cocaine both before the drug screen and again after the drug screen. The Children were removed from Father's home and placed in relative care with their maternal grandparents, and DCS filed CHINS petitions on August 16, 2016. At the hearing held that same day, the Parents admitted that the Children were CHINS due to the Parents' substance abuse.

[5] Following a dispositional hearing on September 27, 2016, the trial court ordered Father to maintain weekly contact with the FCM and notify the FCM of, among other things, any changes in address or arrests. The court also ordered Father to participate in programs and services as recommended by the FCM or other service providers, keep all appointments with service providers and DCS, and participate with home-based services. To address Father's substance abuse specifically, he was ordered to complete a substance abuse assessment and follow all treatment recommendations and submit to random drug screens.[2]

[6] Father's noncompliance with the case plan was documented by the trial court following a review hearing in February 2017. The court found that Father's

---

[2] With respect to drug screens, the order provided that failure to complete a requested screen in a timely manner "will result in a positive result indication. *Exhibits* at 68.

contact with the FCM had been limited since the dispositional hearing. Father had met with a fatherhood engagement worker on "a fairly consistent basis" but had only recently started supervised visits with the Children and had already missed at least one visit. *Id*. at 62. Additionally, Father had yet to submit to random drug screens as ordered five months prior in the dispositional order.

[7] After his initial involvement with fatherhood engagement services and supervised visits, Father's participation in both "tapered off" to the point that the services were closed out as unsuccessful. *Transcript* at 34. The fatherhood engagement provider stopped services for noncompliance in early summer 2017.[3] Before these services stopped, Father submitted to some – about twenty – random drug screens. According to the FCM, "there were clean screens and there were dirty screens [for cocaine] mixed into that." *Id*. at 35. Visitation services were closed due to inconsistent attendance by Father and then restarted during the summer.

[8] In the meantime, Father was arrested on or about July 17, 2017 for Level 6 felony residential entry and Class B misdemeanor criminal mischief. He was released from jail about ten days later and the charges remain pending. Additionally, support orders had been issued on behalf of the Children in March 2017, and Father failed to comply. As a result, the court in the support matter issued a writ of attachment for Father in September 2017. Instead of

---

[3] In explaining why fatherhood engagement services were closed out, Father indicated: "There was nothing that [the provider] could teach me as a Father that I didn't already know." *Id*. at 53.

addressing the support issues, Father chose to stop participating in all services, including visitation, and move out of state. Father has not seen the Children since September 2017, and he has not completed any services ordered by the court in the dispositional order.

[9] A permanency hearing was held on August 23, 2017, at which Father did not appear. The court found at that time that Father had not complied with the case plan. Specifically, "Father never did a substance abuse evaluation, was closed out of visitation and fatherhood engagement, and only periodically comes to the DCS office for drug screens." *Exhibits* at 55. Father remained noncompliant and failed to attend a review hearing in February 2018.

[10] Following a hearing on April 30, 2018, the court modified the dispositional order by changing the permanency plan to adoption and terminating all court-ordered services. The court made the following findings in its modification order: "Parents have been closed out of multiple referred services. They have been closed out of visitation services multiple times as well. Parents have completed no services. Father is allegedly in either Alabama or Florida, and FCM has no idea on mother's location." *Id*. at 42. At a subsequent permanency hearing, which the Parents did not attend, the court once again approved the plan of adoption for the Children.

[11] On July 13, 2018, DCS filed petitions for the involuntary termination of the parent-child relationship between the Parents and the Children. Father was served by publication because Father had not stayed in contact with DCS or

updated his address and DCS could not locate him. The initial termination hearing was scheduled for October 1, 2018.

[12] Father returned to Indiana by September 2018, but he did not contact DCS or make any effort to reestablish services or visits with the Children. He was arrested on September 2, 2018 for failure to appear in the residential entry criminal case but released shortly thereafter.

[13] Father did not appear for the initial termination hearing. As a result, the court continued the initial hearing to be held with the factfinding hearing on October 16, 2018. The court also appointed counsel to represent Father.

[14] On October 16, 2018, Father appeared in person and with counsel for the factfinding hearing. Mother had recently signed consents to adopt and, therefore, did not appear. Father requested a continuance of the factfinding hearing, which the trial court granted. The court briefly commenced the factfinding hearing, to comply with a statutory deadline, and then continued the hearing to December 18, 2019.

[15] The factfinding hearing was concluded on December 18, 2019, after testimony from Father, the FCMs, the CASA, and the maternal grandfather.[4] Records from the 2014 CHINS case and the underlying CHINS case were admitted into

---

[4] The trial court's termination order erroneously indicates that the maternal grandmother, rather than grandfather, testified. The substance of the testimony, however, is accurately reflected in that the grandparents are financially secure, have a sufficiently large home, and wish to adopt the Children.

evidence. Father acknowledged at the hearing that he had not seen the Children for over a year because he fled to Florida to avoid a warrant and that upon his return to Indiana, he had been arrested three times in September and October 2018, including for a new charge of possession of a synthetic drug.[5] On cross examination, the CASA asked Father: "And, we are two and a half years into this case. How much longer do you think it will take you to complete services?" *Id*. at 65. Father responded:

> I have come back home. I've got my name straightened out here, in efforts to try to see my children uh if I were given a chance to do services, I am not asking for no chances here anyway I mean I do want to see my children but I don't I don't know maybe just a couple months? Maybe up to six months. I don't know, maybe not even that much time. I just I don't know. I don't know the ins and outs and what I would have to do you know but I would be more than willing to do it all again if I could.

*Id*. Father then acknowledged that he had been back in Indiana for over three months but had not attempted to contact DCS. He decided to just wait for the factfinding hearing.

[16] Rob Belt, the FCM between August 2016 and September 2018, detailed Father's noncompliance with services and lack of contact with DCS as set out

---

[5] In its findings, the trial court incorrectly indicated that certified records from this new charge were admitted into evidence. In fact, the court took judicial notice of these records.

above.[6]  FCM Belt opined that termination of parental rights was in the Children's best interests.  The plan following termination was adoption by the maternal grandparents, in whose care the Children had been thriving for over two years.

[17]  The CASA testified that Father had not completed any services to remedy the reasons for removal and had not seen the Children in over a year.  Additionally, the CASA testified that the Children are very bonded with their maternal grandparents and are thriving in their care.  The CASA opined that termination was in their best interests.

[18]  On March 4, 2019, the trial court issued its order involuntarily terminating Father's parental rights to the Children.  Father now appeals.  Additional information will be provided below as needed.

## Discussion & Decision

[19]  When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses.  *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016).  Instead, we consider only the evidence and reasonable inferences most favorable to the judgment.  *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.*   In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child

---

[6] The new FCM, Alexa Turpacolous testified that Father had not contacted her regarding services or to report his recent arrests and new criminal charge.

relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. In light of the applicable clear and convincing evidence standard, we review to determine whether the evidence clearly and convincingly supports the findings and whether the findings clearly and convincingly support the judgment. *In re R.S.*, 56 N.E.3d at 628.

[20] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id*.

[21] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by "clear and convincing evidence," among other things, that:

> one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-37-14-2; Ind. Code § 31-35-2-4(b)(2)(B). Here, the trial court relied on I.C. § 31-35-2-4(b)(2)(B)(ii) in granting the termination petition. Father contends that this was erroneous because DCS failed to present clear and convincing evidence that there is a reasonable probability that the conditions resulting in the Children's removal or continued placement outside the home will not be remedied. Specifically, Father asserts that DCS failed to establish that his substance abuse problem still exists.

[22] In deciding whether a reasonable probability exists that conditions will not be remedied, the trial court must judge a parent's fitness to care for his children at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the children. *Id*. The court may consider evidence of the parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. *A.F. v. Marion Cty. Office of Family & Children*, 762 N.E.2d 1244, 1251 (Ind. Ct. App. 2002), *trans. denied*. "A pattern of unwillingness to deal with parenting

problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *In re L.S.*, 717 N.E.2d at 210. "Also, the failure to exercise the right to visit one's children demonstrates a 'lack of commitment to complete the actions necessary to preserve [the] parent-child relationship.'" *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007) (quoting *In re A.L.H.*, 774 N.E.2d 896, 900 (Ind. Ct. App. 2002)), *trans. denied*.

[23] The Children were removed from Father's home due to his substance abuse. On appeal, he argues that DCS failed to prove that he was still using illegal drugs. He asserts that the only evidence of his drug use was from the beginning of the CHINS case and that DCS failed to present any subsequent positive drug screens and FCM Belt only generally testified that some of the twenty screens that Father submitted to had been dirty.

[24] We reject Father's suggestion that DCS was required to show that he was actually still using illegal drugs at the time of the factfinding hearing. Father's noncompliance with services was the reason that DCS had no such evidence. "A parent whose drug use led to a child's removal cannot be permitted to refuse to submit to drug testing, then later claim the DCS has failed to prove that the drug use has continued." *In re A.B.*, 924 N.E.2d 666, 671 (Ind. Ct. App. 2010).

[25] The trial court did not commit clear error in concluding that there is a reasonable probability that the conditions that resulted in the Children's

removal or the reasons for continued placement outside Father's home will not be remedied. The record establishes that the Children were adjudicated CHINS in 2014 due to the Parents' drug use. Less than two years after that case closed, the Children were once again adjudicated CHINS due to the Parents' drug use. After this second adjudication and entry of the dispositional order in September 2016, Father did not begin visiting with the Children until February 2017. By the February 2017 review hearing, he had yet to participate in any random drug screens, had only limited contact with FCM Belt, and had not completed a substance abuse evaluation. Although Father started working with a fatherhood engagement worker in early 2017 and participated in about twenty random drug screens (some of which were positive for cocaine), his compliance was spotty and eventually became nonexistent by the time he fled to Florida in September 2017.

[26] In sum, over the twenty-eight months leading up to the final day of the factfinding hearing, Father never had any period of full compliance with services. He showed inconsistent compliance with some services for about six months in 2017 but then completely abandoned the Children and neglected all court-ordered services for more than a year. Most notably, Father never consistently submitted to random drug screens, he did not obtain a substance abuse evaluation, and he was unsuccessfully discharged from fatherhood engagement. Upon his return to Indiana in September 2018, Father made no contact with DCS to reinitiate services and visitation. He merely waited for the termination factfinding hearing in December 2018 to ask the court for another

chance – up to six months – to complete services. This was far too late, as Father's pattern of behavior displayed his inability or unwillingness to do what was necessary to regain custody of the Children. Father was not fit to care for them at the time of the final hearing, and his actions during the duration of the CHINS case displayed an unwillingness to deal with the issues keeping him from being able to parent the Children.

[27] Judgment affirmed.

Brown, J. and Tavitas, J., concur.