## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 28 2020, 10:55 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Brian A. Karle
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In re the Termination of the Parent-Child Relationship of:

M.A. and D.H. (Minor Children)

and

J.A. (Mother),

*Appellant-Respondent,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

February 28, 2020

Court of Appeals Case No. 19A-JT-1744

Appeal from the Montgomery Superior Court

The Honorable Heather L. Barajas, Judge

Trial Court Cause Nos. 54D01-1808-JT-249, 54D01-1808-JT-251

**Altice, Judge.**

## Case Summary

J.A. (Mother) appeals from the involuntary termination of her parental rights to her two minor children, M.A. (Daughter) and D.H. (Son) (collectively, the Children). Mother challenges the sufficiency of the evidence supporting the termination order.

We affirm.

## Facts & Procedural History

While in a relationship with M.H., Mother gave birth, at the age of nineteen, to Daughter in Wisconsin in February 2013. M.H. is Daughter's legal father, having signed a paternity affidavit.[1] The family moved to Indiana in 2013. When Daughter was about two years old, Mother and M.H. ended their romantic relationship but remained friendly. Thereafter, Mother was Daughter's primary caregiver, moving between Wisconsin – where Mother had family – and Indiana at times.

At some point, Mother began a tumultuous relationship with F.H. and eventually became pregnant with Son. Mother regularly used marijuana while

---

[1] During the underlying CHINS proceedings in September 2017, DNA test results established that M.H. is not Daughter's biological father. He was dismissed from the case but then brought back in after the signed paternity affidavit was discovered.

pregnant. She moved with Daughter multiple times during the pregnancy between Indiana and Wisconsin. They lived with family in Wisconsin, then with F.H. and his mother (Paternal Grandmother) in Indiana, then with a friend until he was deported, then in a homeless shelter, and then in a trailer in Indiana with F.H. and his cousin. By the time of Son's birth in May 2017, Mother and Daughter were living with M.H. rather than F.H.

[5] The Indiana Department of Child Services (DCS) became involved around the time of Son's birth, when the hospital made a report that Mother tested positive for THC. Mother reported that she used marijuana during the pregnancy at least monthly.[2] The hospital staff had concerns that F.H. and M.H. also used illegal substances. DCS family case manager (FCM) Johnathan Chadd investigated the report, and M.H. voluntarily submitted to drug screens, testing positive for THC and methamphetamine. F.H. acknowledged that he used marijuana on a regular basis, which was confirmed by a drug screen. Mother and FCM Chadd developed a safety plan in which Mother agreed to no longer allow Daughter to spend unsupervised time with M.H.

[6] Mother and the Children moved back in with F.H., initially at Paternal Grandmother's house. There was discord within two weeks of Son's birth, so Mother moved out with Daughter to a friend's home in early June. F.H.

---

[2] Son's cord blood screen later came back positive for THC.

moved into this home "once or twice" but then would leave again with Son when Mother and F.H. fought. *Transcript* at 158.

[7]      In the meantime, on June 2, 2017, M.H. had been arrested and charged with multiple counts, the most serious of which was Level 4 felony possession of methamphetamine. He pled guilty on July 17, 2017, pursuant to a plea agreement, to Level 6 felony possession of cocaine and Class B misdemeanor possession of marijuana and was placed on probation.

[8]      DCS filed CHINS petitions on June 23, 2017, and FCM Kimberly Whitus began working with the family. When M.H. was released from jail on July 17, 2017, Mother permitted him to move into the home in which she and Daughter were staying. Shortly thereafter, the electricity was shut off to the home. F.H. then talked Mother into moving into a motel with him, as he had been kicked out of Paternal Grandmother's home. They lived in the motel together with Daughter and sometimes Son, who otherwise was with Paternal Grandmother.

[9]      On August 5, 2017, F.H. contacted FCM Whitus and informed her that he believed Mother was using illegal drugs. Specifically, he reported that the previous night Mother had used what he believed to be heroin in the motel bathroom while Daughter was sleeping. He argued with Mother when she came out of the bathroom and then they fell asleep.

[10]     FCM Whitus and a local police officer came to the motel room the same day as F.H.'s report. The officer found heroin and methamphetamine inside the room in a location within "easy reach" of four-year-old Daughter. *Transcript* at 188.

Mother was not present at the time, and FCM Whitus had difficulty reaching her. When Mother eventually contacted FCM Whitus, she claimed to be out of town. The record is unclear regarding whether the Children were present when FCM Whitus and the officer first arrived, but they were eventually on the scene along with F.H. and Paternal Grandmother.

[11] The Children were immediately removed on an emergency basis from F.H. and Mother's care by FCM Whitus. Son was placed with Paternal Grandmother, and Daughter was placed with M.H. Thereafter, on August 7, 2017, FCM Whitus filed amended CHINS petitions to incorporate these new allegations.

[12] Following a factfinding hearing on September 12, 2017, the Children were adjudicated CHINS. The CHINS order for Daughter contained the following findings of fact:

> a. [Mother] admitted to regularly using THC during pregnancy and felt it was not an issue, endangering the unborn child.
>
> b. [M.H.] also admitted smoking THC and was arrested for possession of methamphetamine, marijuana and cocaine.
>
> c. The parents all lack stability ….
>
> d. There is no stable housing.
>
> e. During an investigation at the Crawfordville Motel where mother was living with [F.H.] for 2 weeks, [F.H.] was concerned about mother's heroin use. Law enforcement found heroin on a knife by the bedside table, as well as drug paraphernalia and

evidence of methamphetamine under the table all accessible to [Daughter].

f. Mother, who is the legal custodian of both the children, is now incarcerated and unable to care for the children.

g. While not under compulsion to participate, the parents agreed to do services and have been inconsistent.

*Exhibits Vol. I* at 120-21. The CHINs order for Son had virtually the same findings. The court ordered that the Children remain in their current placements. However, on September 20, 2017, Daughter was removed from M.H.'s care after he tested positive for methamphetamine, which resulted in his return to jail for violation of his terms of probation. Daughter has since remained in foster care.

[13] A dispositional hearing was held on October 16, 2017. Thereafter, on November 6, the court ordered services for Parents to "address substance abuse issues and underlying related issues." *Id.* at 157. Specifically, the court ordered Mother to, among other things, keep all appointments with service providers, maintain stable housing and income, refrain from using illegal substances, obey the law, submit to random drug screens, participate in supervised visitations, and complete a parenting assessment, substance abuse assessment, and an Intensive Family Preservation program, as well as any recommended services and treatment.

[14] After issuance of the dispositional order, Mother was generally noncompliant with services. By her own account, she was using methamphetamine and living with F.H. and/or friends and "bouncing around after that." *Transcript* at 162. Mother regularly cancelled or was a no-show to supervised visits, she did not participate in intensive outpatient (IOP) treatment as recommended, was noncompliant with homebased services, and failed to appear for the majority of her random drug screens and tested positive for methamphetamine on others. Services were repeatedly closed out due to noncompliance. Further, Mother did not attend the child and family team meetings/case plan conferences on March 10, 2018 or May 21, 2018.

[15] DCS filed a progress report with the court that covered the period of January 8, 2019 through May 10, 2018. The report indicated that Mother, as well as F.H. and M.H., had "made no active progress in the review period." *Exhibits Vol. I* at 227. The report explained:

> She has been inconsistent with visits. She has been discharged for non compliance, twice. Out of 18 possible visits during the review period[.] She has visited with [Daughter] 5 times and [Son] 3 times. Currently has only visited 2 out of 5 potential times and is in danger of being discharged for the 3rd time.
>
> She has not attended any court ordered services for substance abuse or home based casework. She has only submitted to 4 drug screens out of 34, 3 positive for methamphetamine.

*Id*. at 228. The report also indicated that Mother was "currently homeless and unemployed." *Id*. at 230.

[16] Following a permanency hearing on June 27, 2018, the CHINS court granted DCS's request to change the permanency plan to adoption. Additionally, the court relieved DCS from the obligation of offering services to the parents, including visits.

[17] Mother had no contact with the Children or DCS between June and December 2018, and she did not appear for the review hearing in November. During this time, she moved between Indiana and Wisconsin and, in August, was arrested and charged with possession of THC and possession of drug paraphernalia. Bench warrants were issued for her arrest in October and December for failure to appear at hearings on these criminal charges. Mother took drug screens on December 13 and 14, 2018, which came back positive for THC. These were her first drug screens since mid-June 2018, when she tested positive for THC and methamphetamine.

[18] On August 29, 2018, DCS filed the instant petitions for involuntarily termination of parent-child relationship (TPR Petitions). Factfinding hearings were held on the TPR Petitions on November 9, 2018, January 31, 2019, and February 19, 2019.

[19] On the November hearing date, Mother informed the court that she had "[b]asically" been homeless and unemployed since February 2018 and was currently "couch surfing." *Transcript* at 15. A few months later in January, Mother testified that she was still unemployed but had been living for about a month in an apartment under a lease signed by a woman whom Mother termed

a mentor. Mother indicated that she was living with a new boyfriend who "just got out of jail like a week ago" and was on probation for intimidation. *Id*. at 177. She also testified that she was about to run out of money but had a job interview lined up. Mother acknowledged that services had been offered to her multiple times and that she did not participate in those services due to methamphetamine use. She asked the court for another chance with services but acknowledged that the Children "don't deserve" to have to wait for her to gain stability. *Id*. at 180. Finally, Mother testified that while she is bonded with Daughter, she did not feel like she is bonded with Son.

[20] Regarding his stability at the time of the termination hearing, M.H. acknowledged that he was currently without stable housing, was unemployed, had not seen Daughter since her removal from his care, and had been arrested recently for resisting law enforcement and possession of marijuana and had violated probation. When asked about permanency for Daughter, he testified: "Primarily I would suggest her with her parents, but seeing how you look at my rap sheet … and how I'm not financially stable, there could not be a better caregiver on this planet for her right now" than where she is currently placed. *Id*. at 135. Similarly, at the hearing, F.H. indicated that he was unemployed and lacked stability and that Son was "in a good place" with Paternal Grandmother. *Id*. at 142.

[21] FCM Whitus testified on the last day of the hearing and detailed the events leading up to the Children's removal, services offered to Mother, and Mother's response to services. She then summarized as follows:

Since I got this case, the parents have been, the instability has been unreal. There has been, most periods have been homelessness, also drug use. I repeatedly put in so many resources. I've given them the tools to try to clean up their life. To get the stability I've put in homebased case managers over and over again to help them with housing, help with employment, time management, life skills and just repeatedly you know you can give them the tools, but they've got to pick them up and take them. Over and over, I feel like the department has tried to help them and they just aren't willing to do it.

*Id.* at 221-22. FCM Whitus opined that termination of parental rights was in the best interests of the Children, who were both doing well in stable pre-adoptive homes. Paternal Grandmother expressed interest in adopting Son, and Daughter's foster family since October 2017 wished to adopt her.

[22] The CASA, with the family since December 2017, similarly testified that he believed termination was in the Children's best interests. The CASA emphasized the importance of stability and a safe environment for the Children and noted: "Having a home, having a job, having that ability to take care of [the Children] it just never developed through [the CHINS] process." *Id.* at 242. The CASA continued: "I believe [the parents] were given opportunities to reach out and do those services…. [T]hey just never took that step and I wish they would have, but they didn't." *Id.*

On July 19, 2019, the trial court issued its order terminating Mother's parental rights to the Children.[3] Mother now appeals. Additional information will be provided below as needed.

## Discussion & Decision

When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. In light of the applicable clear and convincing evidence standard, we review to determine whether the evidence clearly and convincingly supports the findings and whether the findings clearly and convincingly support the judgment. *In re R.S.*, 56 N.E.3d at 628.

We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet

---

[3] F.H.'s and M.H.'s respective rights were also terminated, but they do not participate in this appeal.

their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things, that one of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>
> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>
> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B); Ind. Code § 31-37-14-2. DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D); I.C. § 31-37-14-2.

Here, Mother argues only that DCS failed to prove by clear and convincing evidence that there is a reasonable probability that she will not remedy the conditions leading to the Children's removal. In this regard, she claims that the

original basis for removal was her alleged methamphetamine and heroin use and that the evidence does not establish a likelihood that she would not remedy that issue because in December 2018 she only tested positive for THC. Further, Mother notes that she obtained an apartment just before the termination hearing and also attempted to restart therapy (completing intake and one therapy session in December 2018 but no IOP sessions).

[28] In addition to rejecting Mother's invitation to reweigh the evidence, we observe that the trial court found that clear and convincing evidence also established that the continuation of the parent-child relationship posed a threat to the Children's well-being. I.C. § 31-35-2-4(b)(2)(B) is written in the disjunctive and, thus, requires the trial court to find only one of the requirements of the subsection by clear and convincing evidence. *See In re L.S.*, 717 N.E.2d at 209. "Standing alone, the finding that the parent-child relationship posed a threat to the well-being of [the Children] satisfies the requirement listed in subsection (B)." *Id*. In other words, we need not reach Mother's arguments related to I.C. § 31-35-2-4(b)(2)(B)(i).

[29] Moreover, the evidence amply supports the trial court's conclusion that a reasonable probability exists that the conditions resulting in the Children's removal or continued placement outside Mother's home will not be remedied.

> In making such a determination, the court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. Due to the permanent effect of termination, the trial court also must evaluate the parent's habitual patterns of conduct

to determine the probability of future neglect or deprivation of the child. The statute does not simply focus on the initial basis for a child's removal for purposes of determining whether a parent's rights should be terminated, "but also those bases resulting in the continued placement outside the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. A court may properly consider evidence of a parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate housing and employment. Moreover, a trial court "can reasonably consider the services offered by the [DCS] to the parent and the parent's response to those services." [*McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003)]. In addition, "[w]here there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005).

*In re N.Q.*, 996 N.E.2d 385, 392 (Ind. Ct. App. 2013) (some citations omitted).

[30] We initially address Mother's challenge to the following finding of fact made by the trial court:

> 7. Allegations of continued drug use were made. The DCS and law enforcement investigated and found [Daughter] in a hotel with her half-brother, [Son], and [F.H.], her mother's boyfriend. Methamphetamine and heroin in the hotel room [were] within [Daughter's] reach.

*Appellant's Appendix* at 60. Mother asserts that the Children were not in the room when the drugs were found but rather were staying with Paternal Grandmother. The evidence on this point is not so clear. FCM Whitus

testified that the Children were present at the time, but then, on cross examination, testified that she was not sure whether they came to the motel with Paternal Grandmother after the discovery of the drugs. Regardless, the evidence established that illegal drugs were found in the motel room in which Mother and F.H. stayed with Daughter (and sometimes Son), and the drugs were found within easy reach of Daughter. The trial court's finding is not clearly erroneous.

[31] The Children were removed from Mother's care in August 2017 and thereafter remained out of her care due to illegal drug use and associated instability in housing and employment. DCS provided her with countless services to address these issues, but Mother consistently failed to cooperate throughout the CHINS proceedings and was regularly discharged for noncompliance. Rather than visit with the Children and work on her substance abuse and instability issues, Mother used methamphetamine and marijuana and remained without stable housing or employment. The trial court summarized Mother's lack of progress in the termination order:

> 15. Mother was discharged from random drug testing with Redwood, supervised visitation, case management, individual therapy and IOP, all for non-compliance. She was discharged from IOP, case management services and supervised visits three times for noncompliance. She failed to appear multiple times for family team meetings. She failed to appear for 13 of her 20 drug screens. Of the seven she attended, she tested positive twice. Mother failed to appear for an appointment with Pam's Promise to secure housing and services. Mother had various excuses for her behavior, including that she was sad, [F.H.] was abusing her,

she overslept, she was looking for a job. Mother had no contact with DCS or the children between June and December 2018. Mother never secured housing, employment, sobriety or stability.

*Id.* at 60-61.

[32] In November 2018, fifteen months after the Children's removal, Mother informed the trial court that she had "[b]asically" been homeless and unemployed since February 2018 and was currently "couch surfing." *Transcript* at 15. At the January 31, 2019 hearing, Mother testified that she was still unemployed but had been living for about a month in an apartment leased to someone else. Mother was living in this apartment with a new boyfriend who had just been placed on probation for intimidation. Mother acknowledged that she was about to run out of money.

[33] The evidence establishes that Mother was in no position to care for the Children at the time of the termination hearing and that she had not made any progress toward gaining stability. Further, we place no stock in Mother's suggestion on appeal that because she tested positive for only THC in December 2018, after six months of no screens, that her "primary substance abuse issue – methamphetamine – was remedied several months before termination." *Appellant's Brief* at 15.

[34] DCS established by clear and convincing evidence that there is a reasonable probability that Mother's behavior and instability will not change. Thus, the trial court's conclusion that there is a reasonable probability that the conditions resulting in the Children's removal and continued placement outside Mother's

care will not be remedied is supported by the evidence and not clearly erroneous. As Mother does not challenge any of the other conclusions made by the trial court, we affirm the termination of her parental rights.

[35] Judgment affirmed.

Robb, J. and Bradford, C.J., concur.