## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 31 2020, 9:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Alexander W. Robbins
Bedford, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General

Monika Prekopa Talbot
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| In the Matter of the Termination of the Parent-Child Relationship of M.E., M.E., and C.E. (children), | August 31, 2020 |
| | Court of Appeals Case No. 20A-JT-77 |
| A.B. (Mother) and D.E. (Father), | Appeal from the Morgan Superior Court |
| *Appellants-Respondents,* | The Honorable Sara A. Dungan, Judge |
| v. | Trial Court Cause Nos. 55D03-1906-JT-230, 55D03-1906-JT-231, 55D03-1906-JT-232 |
| Indiana Department of Child Services, | |



*Appellee-Petitioner.*

**Altice, Judge.**

# Case Summary

A.B. (Mother) and D.E. (Father) (collectively, Parents) jointly appeal the involuntary termination of their parental rights to two of their three children. On appeal, Parents argue that the Indiana Department of Child Services (DCS) presented insufficient evidence to support the termination of their parental rights.

We affirm.

# Facts & Procedural History

Parents have three children:  Mad.E., born November 12, 2008; Mac.E., born September 26, 2015; and C.E., born May 5, 2017.[1]  DCS most recently became

---

[1] During the termination hearing, Parents informed the court that they had agreed to consent to the adoption of Mad.E. (Sibling).  The termination proceedings continued as to Mac.E. and C.E. (collectively, the Children).

involved with Parents on or about November 8, 2017, after Mother called 911 just before 3 a.m. because Mac.E. was having difficulty breathing and needed emergency medical treatment.[2] According to the CHINS petition, Mother became "violent and belligerent" when paramedics arrived, so the paramedics summoned law enforcement. *Exhibits* at 37. Law enforcement arrived and observed that Father was "passed out drunk" and Mother was intoxicated. *Id*. A DCS family case manager (FCM) arrived at Parents' home and observed Parents to be under the influence of alcohol. Mother admitted to consuming at least fifteen beers that evening (November 7) and that Father had approximately six beers. DCS removed the Children from the home and placed them with a relative.

[4] A few hours after the incident, FCM Randa McKinney returned to Parents' home to administer drug screens and observed them both to still be under the influence of alcohol. Mother admitted to relapsing and having already consumed alcohol that morning. Based on this incident, DCS filed a petition alleging the Children were children in need of services (CHINS). At a factfinding hearing on January 25, 2018, the Children were adjudicated CHINS. The court held a dispositional hearing on February 28, 2018, after which the Parents were ordered to, among other things, maintain weekly

---

[2] In May 2017, Parents were involved with a DCS assessment after C.E. was "born positive for alcohol". *Exhibits* at 37. At that time, Mother admitted to drinking sixteen beers a day and Father admitted to smoking marijuana. Following a conviction for misdemeanor battery, Mother participated in services for alcohol abuse through probation in Morgan County from May through November 2017.

contact with their FCM; participate in all recommended programs; keep all appointments with service providers; sign any releases necessary for the FCM to monitor compliance; maintain suitable, safe, and stable housing; secure and maintain a stable source of income; not consume alcohol or any other illegal controlled substances; complete a parenting assessment and successfully complete all recommendations; complete a substance abuse assessment and follow all recommendations; submit to random drug screens; not commit any acts of domestic violence; and attend all scheduled visitations with the Children.

### *Visitation*

Visit supervisor and case manager Chris McMullen conducted supervised visits between Parents and the Children from November 2017 through May 2019. Parents had five to eight hours of visitation per week. McMullen explained that Parents were "very consistent" with their visitation and that the visits went "well" and Parents were "engaged" and "[e]njoyed spending time with their children." *Transcript Vol. 2* at 64-65. He noted no significant safety concerns during visits, that Parents interacted and responded well to the Children, and that there was a bond between Parents and the Children. During the visits, McMullen also worked with Parents and various aspects of case management. He testified that Parents were "open to" and "tried to implement" his parenting suggestions. *Id*. at 65.

[6]     At some point in early 2018, Parents progressed to having the Children in their home.[3] Overall, McMullen found Parents to be "adequate and appropriate" during their interactions. *Id*. at 66. On March 23, 2018, DCS again removed Children from Parents' home because Father tested positive for marijuana and methamphetamine.

[7]     In 2019, Parents participated in visitation "for the most part," until "[t]owards the end" when they cancelled a couple visits at the last minute because they were not feeling well. *Transcript Vol. 2* at 59, 60. Supervised visits were suspended in May 2019 because of Parents missed visits. The visits later resumed, and at the time of the termination hearing in November 2019, Parents still had regular, supervised visits with the Children.

### *Substance Abuse*

[8]     The results of the November 8, 2017 drug screen obtained by FCM McKinney at the time of Children's removal showed that Mother was positive for THC and alcohol. Pursuant to the dispositional order, Mother was to participate in substance abuse treatment at Centerstone. Mother initially complied, submitting to the assessment, and participating in drug rehabilitation. Mother stayed sober for three months.

---

[3] Mac.E. remained in foster care for a short time because she had surgery, but she eventually joined her siblings.

[9]     Kayla Black, a family support specialist and recovery coach at Centerstone, worked with Mother from March 2018 through January 2019 on obtaining employment, parenting skills, and developing a relapse prevention plan. Initially, Mother attended all scheduled meetings with Black. During a team meeting in July or August 2018, Mother admitted that she had relapsed. Thereafter, Mother's participation in services became inconsistent. Mother sometimes contacted Black while she was intoxicated. At the time of the termination hearing, Black acknowledged that Mother was submitting negative screens, but testified that in her opinion, she had not "seen any change" and did not feel that Mother was making progress regarding her ability to maintain sobriety since her most recent return to services. *Transcript Vol. 2* at 213.

[10]    Brandy Mason, a family support specialist with Centerstone, began working with Mother and Father on their substance abuse issues in a group setting in September 2018. Mason provided Mother and Father with life skills training, coping skills, and relapse prevention skills. Mason noted that Mother's participation was sporadic and that Father did not participate in services in October and November as he was in inpatient treatment. Following Father's release, Mason met individually with Father and testified that he was "doing well." *Id*. at 240. Father stayed sober for three months. By the end of 2018, Father's participation in services started becoming inconsistent. In January and February 2019, Father submitted numerous drug screens that were positive for THC, which led to Father's discharge from services provided by Centerstone.

[11]     Mental health therapist Emily Grimwood completed a substance abuse assessment on Mother in late March 2019. She diagnosed Mother with alcohol use disorder based on Mother's own admissions and with a generalized anxiety disorder. Grimwood initially recommended weekly to biweekly treatment, but because Mother continued to abuse alcohol, Grimwood changed her recommendation to inpatient treatment. Mother did not participate in any services following the assessment, so Grimwood closed out services.

[12]     While Mother submitted numerous screens that were negative, Mother tested positive for the metabolites of alcohol on May 9, 14, and 22, and June 6 and August 7, 2019. In November 2019, Mother was participating in group sessions and individual outpatient therapy but was not participating in recovery coaching or life skills classes. From January 2018 through August 2019, Father tested positive for THC at least thirty-eight times. In October 2019, Father tested positive for barbiturates even though he did not have a prescription for the drug. At the time of the termination hearing, Father was engaged in individual and group therapy to address his substance abuse.

[13]     William Andrews, a clinical therapist at the Hamilton Center, treated Father starting in April 2019. Father participated in both individual and group therapy sessions. Although Andrews testified that Father had made some progress toward sobriety, Father did not meet his goal of weekly participation in services. Father ultimately admitted to Andrews that he relapsed.

[14]     Father was most recently arrested in September 2019 after police were dispatched to Parents' home on a possible trespass or noise complaint. When police arrived, Father was sitting in his truck. As officers approached, they observed Father rolling a joint. The officers made contact with Father, who offered to sell them marijuana. While interacting with Father, one of the officers noted a strong odor of alcohol and that Father had slurred speech. Shortly after his arrest, Father started over with his substance abuse program. Since that time, Father has been engaged in individual and group therapy with Andrews. Father claims he is not using alcohol or drugs and that he is attending meetings for Alcoholics Anonymous.

### *Domestic Abuse*

[15]     In addition to substance abuse issues, DCS was made aware of domestic abuse between Mother and Father. Parents would often fight when they are intoxicated and "sometimes it gets physical, sometimes it's just verbal." *Transcript Vol. 3* at 9. Local police were familiar with Parents because of numerous domestic violence calls to their home over the course of eight to nine years preceding the instant termination proceedings. There was even a period in the spring/summer of 2019 when the domestic abuse reports were "daily" until Parents were evicted from their home. *Id*. at 16. On one occasion, Father was arrested after Mother reported that Father struck her and then showed police marks on her body. Mother also reported numerous times that Father was driving drunk, but the police would determine that his truck was parked outside the home. During the summer of 2019, Mother called to report that

Father was missing. When police arrived at their home, Father was sitting outside. An hour later, there was a call about a domestic disturbance at Parents' home. When police arrived, the area was littered with beer cans and Mother was yelling at Father, who was still sitting in the same place he was an hour earlier. Mother admitted to having punched Father, and she was arrested and subsequently charged with domestic battery.

[16] Addie Byers-Bryant, a domestic violence advocate with the Rose Project, provided domestic violence education to Mother from January through June 2019. Byers-Bryant testified that Mother first denied that there was domestic violence in her relationship, but later realized that both she and Father were verbally aggressive toward each other. Byers-Bryant recommended that Mother complete twelve domestic violence classes. After Mother missed two classes, she had to start the program over. Eventually, Mother completed the program. In July 2019, however, Mother was arrested following a domestic violence incident between her and Father. Mother admitted that she had been drinking and that she became verbally aggressive. Thereafter, Mother resumed domestic violence services, with her last session being August 21, 2019. In early September Mother sought in-patient substance abuse treatment.

[17] Jonathan Mangano, a domestic violence counselor with Family's First, conducted two domestic violence assessments on Father, one in January and a second in June 2019. During the first assessment, Father scored high for depression and PTSD, but appeared to be in denial about his substance abuse. During the June assessment, Father was more forthcoming about his substance

abuse. Based on his assessments, Mangano testified that Father used power control tactics such as intimidation and isolation to control Mother. He recommended that Father participate in an intervention program but encouraged Father to first deal with his substance abuse. Mangano eventually enrolled Father in intervention services such as substance abuse treatment, individual therapy, and parenting classes in June 2019 but Father did not participate.

### Housing and Income

[18] At some point, Parents were evicted from their home. In the fall of 2019, Parents were not living together. Mother lived in a "tiny trailer" with her parents, her two sisters, and her sisters' two children. *Id*. at 83. Aside from lack of space for the Children, the home was otherwise acceptable. Father was living with a friend. It was Parents' intent to get an apartment together. At one point, Mother obtained employment. However, at the time of the termination hearing, Mother's sole source of income was $733 per month in SSI.

### Best Interests

[19] FCM Whitney Ksenak was involved with Parents from March 2018 through August 2019. Throughout her involvement, Mother stayed in weekly contact with her "for the most part" and kept her informed. *Transcript Vol. 2* at 183. Mother and Father completed their initial assessments as required by the dispositional order but failed to complete the recommended services. Overall, FCM Ksenak described Parents' participation in services as "up and down,"

noting that "they had really good days or weeks, and then they would have rough ones." *Transcript Vol. 2* at 157. Parents had demonstrated that three months was the longest either of them could maintain sobriety.

[20] FCM Ksenak testified that she spoke with Father about the need to stop his marijuana use to reunite with Children and Father told her that "he can't stop" and that "he had to have it. That was his cope for his anxiety." *Id*. at 200. When she talked to Mother about her alcohol use, Mother always said she was going to stop, but then she would continue to drink. Mother told her that the reason she drank was because she "got bored." *Id*. at 201.

[21] FCM Ksenak testified that termination was in the best interests of the Children because Parents could not maintain sobriety, establish stability in housing and employment, or demonstrate an ability to provide a safe, secure environment for the Children. She was also concerned with Parents' lack of effort to address mental health needs and domestic violence. FCM Ksenak testified that the Children were thriving in their placements. She supported DCS's plan for termination and adoption of the Children by their foster parents.

[22] FCM Crystal Jeffries was assigned to Parents at the time of the termination hearing. FCM Jeffries pointed out that Mother had been arrested in July 2019 for domestic battery and that DCS recommended that she participate again in domestic violence services. By the time of the termination hearing, Mother had completed domestic violence services, completed inpatient substance abuse treatment, and was participating in group therapy. Mother last tested positive

for alcohol in August 2019 and, according to Mother, was scheduled to complete current services in December 2019. Father had started group therapy but was not participating in other services and he had three positive screens for phenobarbital. Despite their recent strides, FCM Jeffries testified that her concerns regarding Parents were not fully alleviated. Considering their history, FCM Jeffries believed that Parents' recent efforts were a continuation of the same cycle. She supported the plan for termination and adoption.

[23] Court Appointed Special Advocate (CASA) Debra Hendrickson testified that the Children began to develop very quickly in foster care and that they were thriving. The Children receive extra help, such as speech therapy and physical and developmental therapy. CASA Hendrickson testified that Parents went through cycles of doing better and relapsing and that because of these cycles, the case never advanced. She acknowledged that Parents had worked hard and had recently successfully completed rehabilitation but noted Parents pattern of making similar progress before regressing back to substance abuse. CASA Hendrickson opined that termination was in the best interests of the Children because Parents are unable to maintain sobriety and the Children are thriving in foster care. She expressed concerns about Parents' ability to provide "safe, sober caregiving" for the Children. *Transcript Vol. 3* at 106. She believed adoption by the current foster parents was in the Children's best interests.

[24] Due to Parents' positive drug tests and their inconsistent (or lack of) participation in services, DCS moved to change the permanency plan from reunification to adoption on May 19, 2019. On June 17, 2019, DCS filed a

petition to terminate Parents' parental rights. The court held a fact-finding

hearing on August 30 and November 14-15, 2019. On December 13, 2019, the

court entered its order terminating Parents' parental rights to Children.[4] In its

order, the court summarized the above in its findings of fact and found as

follows:

> While there has been some progress here and there, the parties
> can't seem to get things together for long enough periods of time
> to allow for reunification. The [C]hildren have not been able to
> be placed back with either parent during the life of the case after
> their second removal. Mother and Father have both failed several
> tests for alcohol and drugs during the life of this case. Mother's
> last positive alcohol screen as recent as August 2019 and Father's
> arrest in September of 2019 just add to the conclusion that the
> [P]arents are not able to meet the needs of the [C]hildren, in
> being safe and sober caregivers. The inability of the parties to
> find housing and stability is also problematic. Stability, housing
> issues, police contact, relapses, and the substantial evidence of
> substance and domestic violence issues are all concerning to the
> Court. Mother and Father have been given multiple
> opportunities and the [C]hildren have waited long enough for
> Mother and Father to get their acts together.

*Appellant's Appendix Vol. I* at 21. The Court therefore concluded that DCS

proved by clear and convincing evidence that there was a reasonable

probability that the conditions resulting in removal of the Children would not

be remedied and that continuation of the parent-child relationship poses a

---

[4] The court took termination of Parents' parental rights to Mad.E. under advisement, pending the outcome of adoption proceedings.

threat to the well-being of the Children. Mother and Father now appeal. Additional facts will be provided as necessary.

## Discussion & Decision

[25] When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses. *In re R.S.*, 56 N.E.3d 625, 628 (Ind. 2016). Instead, we consider only the evidence and reasonable inferences most favorable to the judgment. *In re D.D.*, 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied*. In deference to the trial court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.*, 717 N.E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied*. In light of the applicable clear and convincing evidence standard, we review to determine whether the evidence clearly and convincingly supports the findings and whether the findings clearly and convincingly support the judgment. *In re R.S.*, 56 N.E.3d at 628.

[26] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.*, 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied*. Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.*, 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In*

*re K.S.*, 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id*.

[27] Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things, that one of the following is true:

> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B); Ind. Code § 31-37-14-2. DCS must also prove by clear and convincing evidence that termination is in the best interests of the child and that there is a satisfactory plan for the care and treatment of the child. I.C. § 31-35-2-4(b)(2)(C), (D); I.C. § 31-37-14-2.

[28] On appeal, Parents argue that there is insufficient evidence that the conditions resulting in removal of the Children would not be remedied or that continuation of the parent-child relationship poses a threat to the well-being of the Children. Because DCS was required to establish only one of these by clear and convincing evidence, we focus our review on subsection (b)(2)(B)(i).

[29] In deciding whether a reasonable probability exists that conditions will not be remedied, the trial court must judge the parents' fitness to care for their children at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *Id.* "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *In re L.S.*, 717 N.E.2d at 210. DCS need not provide evidence ruling out all possibilities of change; rather, it need establish only that there is a reasonable probability the parent's behavior will not change. *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[30] Parents assert by the time of the termination hearing they both had shown "significant progress and their commitment toward reunification was clear." *Appellant's Brief* at 9. They point to the fact that they had both recently completed rehabilitative programs and that they had both submitted negative screens for the three months preceding the final termination hearing. They therefore argue that "[i]n light of all the progress [they] made," the trial court erred in concluding that DCS proved by clear and convincing evidence that they would not remedy the conditions that led to removal of the Children or their continued placement outside the home.

[31] "Because a case that seems close on a 'dry record' may have been much more clear-cut in person, we must be careful not to substitute our judgment for the trial court when reviewing the sufficiency of the evidence." *In re E.M.*, 4 N.E.3d 636, 640 (Ind. 2014). Here, the trial court acknowledged evidence from service providers regarding the progress and positive steps Mother and Father took at various times throughout the proceedings. The court also noted, however, evidence showing a cycle of behavior. Parents demonstrated that they could engage in services and achieve and maintain sobriety, but each time was short lived as Parents resorted back to alcohol and drugs that in turn led to domestic violence and instability.

[32] Two years after the Children were initially removed from their care, service providers believed that Parents had effectively made little progress toward maintaining sobriety and establishing a safe and stable home for Children. The trial court agreed. "Where there are only temporary improvements and the pattern of conduct shows no overall progress, the court might reasonably find that under the circumstances, the problematic situation will not improve." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). Here, it clear that the court found Parents' pattern of conduct over the previous two years more telling of the probability of future success than their most recent efforts. We will not second-guess the trial court in this regard. We therefore cannot say that the court's conclusion that there is a reasonable probability that the conditions that resulted in the Children's removal and/or continued placement outside the home will not be remedied is clearly erroneous.

[33]     Judgment affirmed.

Bailey, J. and Crone, J., concur.